NANCY TORO APONTE y LUIS MANUEL ÁLVAREZ, demandantes y recurridos, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO y OTROS, demandados y recurrentes.

*Número:* RE-90-560          *Resuelto:* 31 de enero de 1997

*Jaime V. Biaggi Busquets*, de *Biaggi Busquets & Mari Roca*, abogado de los codemandados y recurridos; *Jorge E. Pérez Díaz, Procurador General, Anabelle Rodríguez, Subprocuradora General*, y *Laura Ydrach Vivoni, Procuradora General Auxiliar*, abogados de El Pueblo, recurrente; *Manuel Cruz Soto*, abogado de los recurridos.

EL JUEZ PRESIDENTE SEÑOR ANDRÉU GARCÍA emitió la opinión del Tribunal.

"La profesión [médica] es una de la que más riesgos entraña, tanto para el que la ejerce como para el que recibe los servicios de la misma. Ello es debido, fundamentalmente, al objeto mismo de esta profesión: el ser humano, el cual queda sujeto a la actuación médica en varios de los aspectos más importantes de su personalidad y en particular la salud." (Escolio omitido.) J. Fernández Costales, *Responsabilidad Civil Médica y Hospitalaria*, Madrid, Ed. Edilex, 1987, pág. 3.

Los médicos Jorge Carlo Font y José Cruz Santiago nos solicitan que revoquemos la sentencia del extinto Tribunal

Superior, Sala de Mayagüez (Hon. Ángel M. Almodóvar Correa, Juez), que les ordenó satisfacer ciento doce mil quinientos dólares ($112,500) como compensación por los daños y perjuicios resultantes de una intervención quirúrgica a la que sometieron a la demandante, Nancy Toro Aponte. Dicha suma equivale al setenta y cinco por ciento (75%) del total de ciento cincuenta mil dólares ($150,000) que el tribunal de instancia concedió a los demandantes por los daños ocasionados a consecuencia de un descuido en el quirófano que resultó en el abandono de una gasa quirúrgica dentro del abdomen de la señora Toro Aponte. Los restantes treinta y siete mil quinientos dólares ($37,500), equivalentes al veinticinco porciento (25%) de responsabilidad, recayeron sobre el Estado Libre Asociado (en adelante E.L.A.), propietario del hospital donde fue operada la demandante y patrono de las demás personas que intervinieron en la cirugía.

Ante nos, mediante recurso de revisión, señalan la comisión de los siguientes errores por parte del foro de instancia: (1) que la compensación otorgada fue excesiva; (2) que se interpretaron equivocadamente unas expresiones como admisión de responsabilidad, y (3) que el E.L.A. debió responder por la totalidad de los daños por ser patrono del causante directo de los daños.

A solicitud de los demandados expedimos el recurso. Procede que confirmemos.

I

Este angustioso drama se inició cuando la joven Nancy Toro Aponte quedó embarazada a fines de 1987 de Luis Manuel Álvarez Vélez, con quien vivía en concubinato. Para atender su embarazo, la señora Toro Aponte acudió a las oficinas conjuntas de los médicos Salvador Rovira Martinó, Jorge Carlo Font y José D. Cruz Santiago, quienes la asistieron durante el período de gestación.

El 29 de junio de 1988, transcurridas treinta y siete (37) semanas, el doctor Cruz Santiago la refirió al Centro Mé-

dico de Mayagüez. Allí fue recluida en el Departamento de Ginecología y Obstetricia del hospital. El manejo y la administración de dicho departamento había sido subcontratado al Centro Ginecobstétrico, una sociedad civil compuesta por los médicos Cruz Santiago, Rovira Martinó y Carlo Font. A eso de la medianoche, el doctor Carlo Font, galeno en funciones a cargo de la Sala de Parto, informó a la señora Toro Aponte que su parto habría de ser mediante cesárea,[1] la cual practicó esa madrugada.

En la sala de operaciones le acompañaron el anestesiólogo Ernesto Santini, la Dra. Laura Ríos,[2] la enfermera circulante Norma Arroyo y el técnico de sala de operaciones Jaime Ortiz.[3] El doctor Carlo Font logró con éxito el alumbramiento de una niña y, antes de cerrar la herida, requirió un conteo de los instrumentos y gasas utilizadas. La enfermera Arroyo le aseguró que todos los utensilios quirúrgicos estaban fuera del cuerpo de la paciente y así lo hizo constar mediante una certificación en el expediente de la operación. Confiando en el conteo de la enfermera, el galeno procedió a suturar la herida.

En aparente recuperación, la señora Toro Aponte fue dada de alta del Centro Médico de Mayagüez dos (2) días después de la operación y regresó a su hogar. Transcurridos ocho (8) días del alumbramiento, la señora Toro Aponte visitó al doctor Cruz Santiago en su consultorio para que removiera los puntos de sutura. Allí le informó al médico que desde la cirugía había estado experimentando un dolor intenso en el vientre. El doctor Cruz Santiago supuso que el malestar se debía al trauma de la operación y le recetó

---

[1] Se define *cesárea* como "[o]peración quirúrgica para extraer un feto a través de la pared abdominal ...". *Diccionario Médico Teide*, Barcelona, Ed. Teide, 1988, pág. 103.

[2] Según el testimonio del Dr. Jorge Carlo Font en la vista en su fondo, la Dra. Laura Ríos sufrió un mareo durante la operación y tuvo que abandonar la sala prematuramente. Exposición Narrativa de la Prueba Oral (en adelante ENP), pág. 14.

[3] La función del técnico de sala, también conocido como instrumentista o *scrub nurse*, es ayudar en el conteo de los utensilios quirúrgicos y organizar la mesa de materiales. ENP, págs. 13 y 15.

analgésicos. Al cabo de tres (3) semanas, los medicamentos no habían surtido efecto, el dolor se había tornado "horrible" y había comenzado a padecer de diarreas, según el testimonio de la perjudicada. Exposición Narrativa de la Prueba Oral (en adelante ENP), pág. 3. Así las cosas, acudió nuevamente a las oficinas de sus médicos. El doctor Cruz Santiago volvió a examinarla mediante examen vaginal y se percató que la matriz de la señora Toro Aponte estaba inflamada. Aun así, dicho facultativo no consideró necesario tomarle un sonograma o radiografías.

Inconforme, la señora Toro Aponte decidió obtener una segunda opinión. Acudió al consultorio de la Dra. Elena Arroyo, especialista en medicina de la mujer. La doctora Arroyo sospechó que algo andaba mal, pues los dolores relacionados con una operación de cesárea suelen desaparecer en menos de dos (2) semanas. Al examinarla, palpó una masa en el vientre, le instruyó a hacerse un sonograma sin dilación y consultar a su ginecólogo o a otro especialista si así prefería. La señora Toro Aponte se hizo el sonograma tal cual le indicaron y regresó, una vez más, a las oficinas de los médicos demandados.

En esta ocasión la atendió su cirujano, el doctor Carlo Font, quien insatisfecho con el sonograma que le había provisto la señora Toro, le requirió hacerse otro. Para entonces ella había perdido toda la fe y la confianza en sus médicos, por lo cual, en vez de seguir la recomendación del doctor Carlo Font, optó por recurrir a otro médico. Consecuentemente, el 26 de agosto visitó al Dr. Héctor Casanova. Aunque dicho galeno le recetó antibióticos intravenosos, su condición no mejoró mucho durante el fin de semana. El lunes siguiente amaneció con vómitos, diarreas y un dolor irresistible. Ese mismo día el doctor Casanova le ordenó que se hiciera unas radiografías y un sonograma en la Clínica Perea de Mayagüez con carácter de urgencia. La radiografía reflejó la presencia de un cuerpo extraño en el área del abdomen, por lo cual dicho facultativo procedió inmediatamente a practicarle una cirugía exploratoria.

*El doctor Casanova y el cirujano Pedro E. Pérez Pérez hallaron en el abdomen de la señora Toro Aponte una gasa quirúrgica que medía 43 cm. de largo y 40 cm. de ancho, adherida a la sección inferior del intestino delgado (ileo), en el punto en que desemboca en el colon.*([4]) La infección era de tal magnitud que al remover la gasa se perforó la pared del intestino grueso. Además, había desarrollado peritonitis e inflamación extensa en los tejidos adyacentes. El doctor Pérez tuvo que hacer una resección parcial del intestino, de una longitud de aproximadamente cinco (5) a seis (6) pulgadas,([5]) y readherirle el intestino delgado al colon mediante una unión suturada (anastomosis). Para que dicha anastomosis pudiese cicatrizar adecuadamente le practicó una colostomía([6]) de manera que pudiera evacuar a través de una incisión en el abdomen. La señora Toro Aponte estuvo diez (10) meses evacuando a través de una funda y, posteriormente, fue sometida a otra operación para cerrar la colostomía.

Como consecuencia de estos hechos, el 23 de diciembre de 1988 la señora Toro Aponte y su compañero, Luis Manuel Álvarez Vélez, demandaron a los médicos asociados al Centro Ginecobstétrico, doctores Carlo Font, Cruz Santiago y Rovira Martinó;([7]) a sus respectivas sociedades de

---

([4]) El *colon* se define como la "[p]arte principal del intestino grueso ... [que] no tiene función digestiva pero absorbe grandes cantidades de agua y electrólitos de los alimentos no digeridos procedentes del intestino delgado. Los movimientos peristálticos intensos que se producen a ciertos intervalos mueven el contenido deshidratado (heces) hacia el recto". *Diccionario Médico Teide, op. cit.*, pág. 127.

([5]) La *resección* se define como la "[e]xtirpación de una parte u órgano de los extremos de los huesos y otros tejidos". *Diccionario Terminológico de Ciencias Médicas*, 12ma ed., Barcelona, Salvat Editores, 1984, pág. 240.

El Dr. Pedro E. Pérez Pérez declaró en la vista en su fondo que la resección del intestino delgado midió cerca de diez (10) centímetros a cada lado, equivalente a poco menos de ocho (8) pulgadas. ENP, pág. 10.

([6]) La *colostomía* es una "[o]peración quirúrgica mediante la cual se aboca a la pared abdominal una zona del colon que permite el drenaje o la descompresión del intestino a través de la abertura artificial. ... Generalmente se aplica una bolsa sobre la abertura de la colostomía ... para recoger las heces ...". *Diccionario Médico Teide, op. cit.*, pág. 129.

([7]) Los doctores Cruz Santiago, Carlo Font y Rovira Martinó presentaron una demanda de coparte contra el Estado Libre Asociado (en adelante E.L.A.), alegando

bienes gananciales; a la Dra. Laura Ríos y su sociedad de bienes gananciales;[8] al Estado Libre Asociado de Puerto Rico[9], y a dos (2) demandados de identidad desconocida, reclamando daños por negligencia. En la reclamación judicial la señora Toro Aponte y el señor Álvarez Vélez alegaron que el descuido de haber dejado la gasa en el interior del cuerpo de la demandante les causó daños severos, tanto físicos como emocionales. Además de los contratiempos médicos y el dolor físico y emocional que dichos daños ocasionaron, los demandantes alegaron que sus relaciones íntimas se vieron afectadas por la colostomía[10] y que se afectó el desempeño de sus respectivas funciones en el hogar. Reclamaron dos millones de dólares ($2,000,000) en compensación por los daños y perjuicios, diez mil dólares ($10,000) en honorarios de abogados y las costas.

Tras celebrar vista en su fondo, el 18 de junio de 1990 el tribunal dictó sentencia a favor de los demandantes, condenando al E.L.A. y a los doctores Cruz Santiago y Carlo Font al pago solidario de ciento cuarenta mil dólares ($140,000) por los daños ocasionados a la señora Toro Aponte y diez mil dólares ($10,000) por los daños sufridos

---

que de haberse cometido una omisión negligente tenía que imputarse a los empleados del Centro Médico, en cuyo caso el Estado tendría que responder ante los demandantes. Solicitaron, que, de imponerles responsabilidad solidaria con el E.L.A., obligase al Estado a reembolsarles lo que tuvieran que pagar.

El Estado reconvino contra los médicos del Centro Ginecobstétrico y alegó que eran ellos quienes estaban a cargo de administrar el Departamento de Obstetricia y Ginecología del Centro Médico de Mayagüez y supervisar al personal médico, por lo cual debían responder vicariamente. Solicitó por igual que se ordenase a los médicos reembolsarle cualquier suma que se viera obligada a pagarle a los demandantes.

La causa de acción incoada contra el Dr. Salvador Rovira Martinó fue desestimada mediante Sentencia Parcial de 7 de diciembre del 1989, fundamentándose en que su intervención con la perjudicada se limitó a la etapa prenatal, es decir, antes de que ocurriera el daño.

[8] Mediante Sentencia Parcial de 20 de julio de 1989, el tribunal de instancia desestimó las reclamaciones contra la Dra. Laura Ríos, por estar cobijada por la inmunidad que extiende a los empleados del Estado el Art. 41.050 del Código de Seguros, 26 L.P.R.A. sec. 4105.

[9] Además, se incluyeron como demandados a los Departamentos de Justicia y de Salud, así como al Centro Médico de Puerto Rico.

[10] Según el testimonio de los demandantes, el aditamento era tan desagradable e incómodo que les impedía sostener relaciones íntimas.

por el señor Álvarez Vélez.[11] En su sentencia, el foro sentenciador impuso igual grado de responsabilidad a los demandados a los únicos fines de la relación interna entre los causantes del daño. Posteriormente acogió una moción de reconsideración y, mediante resolución, modificó los grados de responsabilidad aumentando la de los médicos al setenta y cinco por ciento (75%).

De dicha sentencia, y de la resolución que la modificó, recurren los doctores Cruz Santiago y Carlo Font. Examinemos los tres (3) señalamientos de error en los que se fundamentan para solicitarnos la revocación de los dictámenes del tribunal. Por considerarlo apropiado discutiremos, en primer término, el último señalamiento de error.

## II

Los recurrentes alegan que el tribunal de instancia erró al fijarles el grado mayor de responsabilidad por la negligencia. Sostienen que el E.L.A. debe asumir la totalidad o la mayor parte de la responsabilidad porque era el patrono de la causante directa del daño, la enfermera Arroyo.

En nuestra jurisdicción, la responsabilidad civil derivada de actos u omisiones culposas o negligentes se rige por lo dispuesto en el Art. 1802 de nuestro Código Civil, 31 L.P.R.A. sec. 5141.[12] *J.A.D.M. v. Centro Com. Plaza Carolina*, 132 D.P.R. 785 (1993); *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990); *Valle v. Amer. Inter. Ins. Co.*, 108 D.P.R. 692 (1979); *Gierbolini v. Employers Fire Ins. Co.*, 104 D.P.R. 853 (1976). Para que exista responsabilidad

---

[11] En Puerto Rico rige el principio de solidaridad de los cocausantes de un daño ante el perjudicado. *Sánchez Rodríguez v. López Jiménez*, 118 D.P.R. 701 (1987). Véase, además, *Ramos v. Caparra Dairy, Inc.*, 116 D.P.R. 60 (1985).

[12] Dicho artículo dispone:

"El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización." 31 L.P.R.A. sec. 5141.

civil bajo el citado artículo es necesario que concurran los elementos siguientes: un daño, una acción u omisión negligente y la correspondiente relación causal entre el daño y la conducta culposa o negligente. *Ramírez v. E.L.A.*, 140 D.P.R. 385 (1996); *Tormos Arroyo v. D.I.P.*, 140 D.P.R. 265 (1996); *Monllor v. Soc. de Gananciales*, 138 D.P.R. 600 (1995).

El concepto "culpa" del Art. 1802, *supra*, es tan amplio y abarcador como suele ser la conducta humana. *Reyes v. Sucn. Sánchez Soto*, 98 D.P.R. 305, 310 (1970). La *culpa* o *negligencia* es la falta del debido cuidado, que a la vez consiste en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias. *Ramos v. Carlo*, 85 D.P.R. 353, 358 (1962). La necesidad de una convivencia social ordenada impone un deber general de corrección y prudencia en relación con los demás ciudadanos, y el acto es ilícito en sentido extracontractual cuando viola los deberes generales de corrección o conducta correcta, deberes que no están escritos en los códigos pero que representan el presupuesto mínimo sobreentendido del orden de la vida social. *Ramos v. Carlo*, supra.

"La culpa consiste en la omisión de la diligencia exigible, mediante cuyo empleo podría haberse evitado el resultado dañoso." C. Rogel Vide, *La Responsabilidad Civil Extracontractual*, Ed. Civitas, 1976, pág. 90. La diligencia exigible es la que cabe esperar del ser humano medio, el buen *pater familias*. Si el daño es previsible por éste, hay responsabilidad. Si no es previsible, estamos generalmente en presencia de un caso fortuito. *Jiménez v. Pelegrina Espinet*, 112 D.P.R. 700, 704 (1982). En el pasado, citando a Manresa, hemos afirmado que la culpa y la negligencia son caras de una misma moneda, pues " 'la culpa requiere la ejecución de un acto positivo que cause un perjuicio a otra persona distinta de la que lo llevó a cabo, y a su vez la negligencia supone una omisión que produzca el mismo

efecto, si bien ambas tienen de común el que el acto se ejecute o se incurra en la omisión sin intención nociva. ...' 12 Manresa, *Comentarios al Código Civil Español*, 6ª ed., 1973 pág. 837". *Gierbolini v. Employers Fire Ins. Co.*, supra, pág. 857.

■ Para determinar si una omisión genera responsabilidad se considerarán los elementos siguientes: (1) la existencia o inexistencia de un deber jurídico de actuar por parte del alegado causante del daño, el incumplimiento del cual constituye la antijuridicidad, y (2) *si de haberse realizado el acto omitido se hubiera evitado el daño. Tormos Arroyo v. D.I.P.*, supra; *Arroyo López v. E.L.A.*, 126 D.P.R. 682 (1990); *Soc. Gananciales v. G. Padín Co., Inc.*, 117 D.P.R. 94 (1986).

■ Por último, reiteramos que en nuestro ordenamiento rige la teoría de causalidad adecuada. Conforme a ella, "no es causa toda condición sin la cual no se hubiera producido el [daño], sino la que ordinariamente lo produce según la experiencia general". J. Santos Briz, *Derecho de Daños*, Madrid, Ed. Rev. Der. Privado, 1963, pág. 215. Véanse: *Soto Cabral v. E.L.A.*, 138 D.P.R. 298 (1995); *Miranda v. E.L.A.*, 137 D.P.R. 700 (1994); *Jiménez v. Pelegrina Espinet*, supra; *Soc. de Gananciales v. Jeronimo Corp.*, 103 D.P.R. 127, 134 (1974). Así, pues, "[u]n daño parece ser el resultado natural y probable de un acto negligente si después del suceso, y mirándolo retroactivamente el acto que se alega ser negligente, tal daño aparece como la consecuencia razonable y ordinaria del acto". *Torres Trumbull v. Pesquera*, 97 D.P.R. 338, 343–344 (1969). Expuesto este trasfondo doctrinario, analicemos la controversia ante nos.

En autos, la existencia de los daños sufridos por los demandantes recurridos no está en controversia. Tampoco la negligencia de la enfermera Arroyo en el conteo de las gasas, su relación laboral con el Estado, y la responsabilidad de éste último por los actos de su empleada al amparo del Art. 1803 del Código Civil, 31 L.P.R.A. sec. 5142. Procede

que evaluemos si el médico fue negligente al dejar una gasa en el interior del cuerpo de la demandante. Concluimos en la afirmativa.

■ Debemos enfatizar que estamos ante una omisión de carácter grave en la realización de la intervención quirúrgica. Aunque la responsabilidad inicial sobre el conteo de los instrumentos y materiales utilizados recae sobre la enfermera o asistente, es el médico a cargo quien debe cerciorarse, por todos los medios, que en efecto no queda ningún objeto en el área operada. El conteo de instrumentos o gasas por parte de los asistentes es un método alterno de seguridad y corroboración para evitar que el cirujano omita su deber indelegable de remover un objeto que no debe quedarse dentro del cuerpo del paciente. El médico a cargo de la operación posee absoluto control sobre los instrumentos y materiales que introduce al cuerpo humano. Por ello, sobre dicho facultativo recae la obligación primordial de remover todos los utensilios introducidos al cuerpo y asegurarse, una vez finalizada la intervención, que han sido retirados del interior del paciente.[13]

■ El médico no puede perder de vista que su responsabilidad directa con todo paciente está por encima de la de la enfermera y demás personal auxiliar. Su responsabili-

---

[13] En la jurisdicción norteamericana, ante situaciones similares, se ha llegado a igual conclusión. A modo comparativo, examínense: D.W. Louisell, *Medical Malpractice*, M. Bender, 1995, secs. 3.08, 8.08[7], 14.02; 61 Am.Jur.2d, "Physicians and Surgeons, etc.", sec. 258, pág. 397–399 (1981). Véanse, además: *Sebastien v. McKay*, 649 So. 2d 711, 714 (La. App. 3 Cir. 1994); *Ravi v. Williams*, 536 So. 2d 1374 (Ala. 1988); *Grant v. Touro Infirmary*, 223 So. 2d 148, 154–155 (La. 1969).

Concurrimos con las expresiones del Tribunal Supremo de Alabama, que al pasar juicio sobre un caso virtualmente idéntico al de autos concluyó:

"La responsabilidad de remover las gasas era del médico y no de las enfermeras que lo ayudaban. Él ejerció el control exclusivo sobre las gasas desde el momento en que las colocó dentro del cuerpo de la demandante hasta que las removió. El mero hecho de que el demandado delegaba la tarea de *contar* las gasas, una vez *él* las había *removido* del paciente, de ninguna manera libera al demandado de su responsabilidad de removerlas en primera instancia. Él tiene el deber y la responsabilidad de remover todas las gasas. La responsabilidad de las enfermeras de contarlas luego de que han sido removidas no es sino una *precaución* adicional tomada por el demandado para ayudarle a asegurarse de que ha cumplido apropiadamente con su deber. (Traducción nuestra y énfasis en el original.) *Powell v. Mullins*, 479 So. 2d 1119, 1126 (Ala. 1985).

dad no queda adecuadamente descargada con meramente delegar en un asistente el cotejo de los utensilios, sin corroborar, de manera certera, que no quedan objetos extraños en el interior del cuerpo humano. Semejante práctica no es cónsona con el ejercicio diligente de la profesión médica, la cual por su naturaleza requiere el mayor grado de cuidado y cautela. No existe justificación para apartarse de las normas más elementales que deben observarse para garantizar la salud, la seguridad y el restablecimiento del paciente intervenido. A fin de cuentas, no estamos frente a un objeto más; se trata de un cuerpo humano y, ante todo, de una vida que no admite sustituto.

La única prueba sobre la diligencia del doctor Carlo Font en el desempeño de sus deberes consistió en su aseveración en la vista en su fondo de que "luego de la operación inspeccion[ó] la cavidad donde él intervino [y] ... no notó nada anormal". ENP, pág. 13.

El tribunal concluyó que la conducta negligente de los médicos demandados no se limitó a la omisión de remover la gasa en el quirófano. En su sentencia destacó el hecho de que el doctor Cruz Santiago no le hubiese ordenado a la señora Toro Aponte a hacerse pruebas la primera vez que se quejó de dolor en el vientre durante su primera visita al consultorio tras la operación, y que el doctor Carlo Font no hubiese detectado o sospechado de que algo andaba mal cuando examinó a la paciente posteriormente y detectó inflamación y la presencia de una masa en el área del vientre. Comparó la manera en la que los doctores Cruz Santiago y Carlo Font respondieron a la atención que requería la señora Toro Aponte con la atención desplegada por los otros médicos que consultó la demandante, tal como la prontitud con la que el doctor Casanova detectó la causa del mal que aquejaba a la paciente, y concluyó que los doctores anteriores no habían alcanzado el estándar de diligencia que la situación requería.

En conclusión, el tratamiento posterior brindado a la señora Toro Aponte por parte de los doctores Carlo Font y Cruz Santiago contribuyó significativamente a dilatar y

agravar el daño. No utilizaron todos los medios disponibles para realizar un diagnóstico rápido y confiable sobre la causa del padecimiento. Ante los reclamos de la perjudicada, el tratamiento se limitó a recetar analgésicos. En estas circunstancias, es forzoso concluir que de haberse tomado medidas más efectivas —como hicieron posteriormente otros galenos— el daño no hubiese sido de tal magnitud. Finalmente, está presente el elemento de relación causal entre la omisión negligente y el daño causado. La omisión del galeno —obviamente negligente— fue sin duda alguna la causa del daño.

A manera de epílogo recordamos las expresiones de Joaquín Ataz López, un reputado estudioso de la responsabilidad civil médica: *"La impericia es siempre un incumplimiento.* Cuando un profesional se compromete a realizar determinado acto de su especialidad, recae sobre él una presunción de pericia; y si resulta imperito, ha defraudado la confianza puesta en él, y no ha realizado el acto encomendado correctamente, por lo que su responsabilidad civil se basaría en ese incumplimiento." (Énfasis en el original.) J. Ataz López, *Los médicos y la responsabilidad civil*, Madrid, Ed. Montecorvo, 1985, pág. 282.

La conducta negligente desplegada por los doctores Carlo Font y Cruz Santiago, durante y después de la operación, justifica la imposición de un grado de responsabilidad mayor por el daño. El tribunal actuó correctamente al modificar los grados de negligencia e imponer setenta y cinco por ciento (75%) a los médicos y veinticinco por ciento (25%) al E.L.A.

## III

De otra parte, los doctores Carlo Font y Cruz Santiago sostienen que los daños que sufrieron los demandantes recurridos "fueron instantáneos, pasajeros y [no dejaron] incapacidad alguna". Alegato de los recurrentes, pág. 9. Como único fundamento para respaldar su conclusión de

que la compensación debe ser reducida, citan jurisprudencia de este Tribunal en la cual, alegadamente, la magnitud de los daños fue mayor y la compensación concedida menor. Sostienen que al comparar la dimensión de los daños y la compensación otorgada en el caso de epígrafe con la de otros casos "similares", resulta evidente que el tribunal de instancia sobreestimó los daños de los demandantes. No tienen razón.

De entrada, reiteramos "que en relación con [la] difícil y angustiosa labor de estimación de daños, los tribunales de instancia, de ordinario, están en una mejor posición que los tribunales apelativos para evaluar la situación por cuanto son los que tienen contacto directo con la prueba que a esos efectos presenta la parte que los reclama". *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443, 451 (1985). Véanse: *Quiñones López v. Manzano Pozas*, 141 D.P.R. 139 (1996); *Torres Solís et al. v. A.E.E. et als.*, 136 D.P.R. 302 (1994). De ahí que la parte que solicita la modificación de las sumas concedidas a nivel de instancia viene obligada a demostrar la existencia de las circunstancias que hacen meritorio el que se modifiquen. *Rodríguez Cancel v. A.E.E.*, supra. Por tal razón sólo intervendremos con la cuantía concedida si es excesivamente exagerada o ridículamente baja. *Sanabria v. E.L.A.*, 132 D.P.R. 769 (1993); *Riley v. Rodríguez de Pacheco*, 119 D.P.R. 762, 805 (1987); *Urrutia v. A.A.A.*, 103 D.P.R. 643, 647–648 (1975).

Recuérdese que "no hay dos casos exactamente iguales; cada caso se distingue por sus propias y variadas circunstancias. Es por ello que ... la decisión que se emita en un caso en específico en relación con esta materia no puede ser considerada como precedente obligatorio para otro caso". *Rodríguez Cancel v. A.E.E.*, supra. Véase *Vda. de Silva v. Auxilio Mutuo*, 100 D.P.R. 30, 34 (1971); *Baralt v. Báez*, 78 D.P.R. 123, 127 (1955). La valorización responde a factores particulares y únicos que no se prestan a extrapolación indiscriminada entre un caso y otro. La com-

pensación otorgada a los demandantes recurridos ha de ser considerada conforme los hechos particulares de este caso.

La situación ante nos encarna daños intensos y extensos. Al momento de los hechos la perjudicada tenía veintiocho (28) años de edad y disfrutaba de perfecto estado de salud. Como resultado inmediato de la negligencia del médico y de la enfermera que la atendieron en la intervención, sufrió un daño orgánico severo; requirió dos (2) cirugías adicionales, tras las cuales se vio forzada a permanecer internada en el hospital en estado de convalecencia. Como si fuera poco, durante diez (10) meses se vio forzada a utilizar un aditamento artificial adherido a la perforación en el abdomen para evacuar, el que afectó severamente sus relaciones íntimas e impidió el desempeño de las actividades domésticas y recreativas. Finalmente, estuvo afligida por un dolor intenso y constante por más de dos (2) meses. Al presente continúa sufriendo de dolores en su sistema digestivo y al sostener relaciones sexuales. Su abdomen quedó marcado permanentemente con una segunda cicatriz, que intersecta perpendicularmente a la de la cesárea. ENP, pág. 5.

Los demandantes también desfilaron prueba sobre los daños sufridos por el señor Álvarez Vélez como resultado de los daños sufridos por la señora Toro Aponte. Según testificó éste en el juicio, la condición física y el estado anímico de su compañera le causó mucho sufrimiento y afectó la relación de ambos, al extremo de considerar la posibilidad de separarse. Para atender a ambas, madre e hija, tuvo que depender de la ayuda de otras personas y hacer los quehaceres hogareños. ENP, págs. 6–8.

Este trasfondo fáctico confirma la magnitud de los daños causados lo suficiente como para no intervenir con la compensación concedida. Los argumentos que esgrimen los doctores Cruz Santiago y Carlo Font no nos convencen de que la compensación concedida por el tribunal de instancia haya sido exagerada. La prueba de los demandantes estableció a satisfacción del foro de instancia la gravedad de los daños, prueba que no fue refutada por los demandados. El

examen comparativo de jurisprudencia que nos señalan los demandados recurrentes no nos persuade a modificar la determinación del tribunal de instancia.

## IV

Por último, los demandados recurrentes señalan que el foro sentenciador erró al concluir que ellos admitieron su responsabilidad civil por la negligencia. Señalan que, aunque admitieron la ocurrencia de una omisión negligente, no aceptaron la responsabilidad.

El señalamiento carece de fundamentos. Ante el tribunal de instancia el abogado de los demandados, Lcdo. Jaime V. Biaggi, expresó en dos (2) ocasiones "que sus representados han aceptado responsabilidad ...". Minuta de 10 de octubre de 1989. Copia de la minuta fue enviada al licenciado Biaggi el 16 de octubre de 1989, y el expediente no revela que hubiese sido objetada.

Los demandados también expresaron al tribunal, en varias ocasiones, que desconocían a qué parte y en qué grado debía imputarse la negligencia, lo que le resta credibilidad a su argumento de que negaron su responsabilidad. En todo caso, la admisión de la ocurrencia de una omisión negligente redujo la controversia a determinar a quién correspondía la responsabilidad primaria. El tribunal, fundamentándose en la prueba y no únicamente en la admisión de responsabilidad de los demandados recurrentes determinó que correspondía a ellos haber tomado las medidas apropiadas para haber evitado la ocurrencia del daño, y que dicha omisión fue la causa del daño.

Por los fundamentos antes expuestos, *se confirmará la sentencia del tribunal de instancia en cuanto a la responsabilidad solidaria del E.L.A. y los doctores Carlo Font y Cruz Santiago, así como la Resolución que modificó los respectivos grados de negligencia. Se dictará la correspondiente sentencia.*

El Juez Asociado Señor Rebollo López emitió una opi-

nión disidente. La Juez Asociada Señora Naveira de Rodón se inhibió.

— O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

No podemos brindarle nuestra conformidad a la decisión que en el presente caso emite el Tribunal. Específica, *y enérgicamente*, disentimos de la acción errónea del Tribunal de establecer una norma que le imponga responsabilidad civil, *de manera absoluta y automática*, a los cirujanos de este País en relación con todos y cada uno de los actos de negligencia en que puedan incurrir los empleados de una sala de operaciones mientras se lleva a cabo una intervención quirúrgica; personas que *no* son empleados de dichos facultativos médicos, *como tampoco* fueron seleccionados *ni* adiestrados por éstos y sí por la institución hospitalaria en que se lleva a cabo dicha intervención.

La mayoría de los integrantes del Tribunal impone o establece esta responsabilidad civil absoluta a los cirujanos de nuestro País aplicando —*sin decirlo expresamente*— por primera vez en nuestra jurisdicción la "doctrina del capitán del barco,([1]) doctrina desarrollada en las jurisdicciones del "derecho común", la cual *no* sólo en la actualidad está en desuso y desacreditada, *sino que* es minoritaria.

La errónea decisión emitida desafortunadamente tendrá la nefasta consecuencia de impedir que estos facultativos médicos puedan delegar en los empleados del quirófano del hospital en que se lleve a cabo la intervención quirúrgica *las funciones que tradicionalmente se han delegado a dichos asistentes en aras de una más eficiente y eficaz prác-*

---

([1]) En *Vda. de López v. E.L.A.*, 104 D.P.R. 178 (1975), este Tribunal dejó *quaere* la determinación sobre si se debía adoptar o no la "doctrina del capitán del barco" en Puerto Rico. Específicamente, allí se indicó que "[era] innecesario resolver ... la adopción o no en Puerto Rico de la doctrina de capitán de barco, puesto que estimamos que la prueba de los demandantes fue insuficiente para rebatir la presunción de cuidado razonable al paciente". (Escolio omitido.) Íd., pág. 182.

*tica de la cirugía.* Esto es, la norma de responsabilidad absoluta hoy establecida forzará al cirujano a realizar personalmente la mayoría de las funciones que, de ordinario, realizan dichos empleados; ello con el propósito de poder cerciorarse de que tales funciones son realizadas correctamente. La Mayoría se olvida de que la mejor práctica de la medicina hace imperativo que los cirujanos lleven a cabo su función de operar libre de las "distracciones" que conlleva el no poder delegar dichas actividades en el personal de apoyo.

De ahora en adelante podemos visualizar el caos que reinará en las salas de operaciones del país ante la justificada "paranoia" de los cirujanos de cerciorarse, hasta el punto de terminar haciéndolo ellos, de que los datos provistos tradicionalmente por el personal de apoyo de la sala de operaciones son correctos. Nos imaginamos, pues, al cirujano contabilizando innecesariamente instrumentos y materiales previo a comenzar la operación, realizando la operación y, a la vez, asegurándose de tomar los signos vitales del paciente y de que el paciente esté reaccionando adecuadamente a la anestesia que le fue suministrada.

I

De entrada, recordamos "que el derecho de daños en Puerto Rico se rige, con contadas excepciones que nuestra legislación ha establecido, por las normas del derecho civil. Las reglas del derecho común y de otros sistemas jurídicos pueden constituir material útil para el estudio comparado y en ocasiones el desarrollo de instituciones autóctonas". *Gierbolini v. Employers Fire Ins. Co.*, 104 D.P.R. 853, 855 (1976).

En el día de hoy, la mayoría de este Tribunal hace *caso omiso* a dicha norma, utilizando como fundamentos para su decisión doctrinas ajenas a nuestro sistema de derecho civil. *Entendemos que la controversia de autos debió haber sido resuelta conforme a los mandatos del ordenamiento civilista.* Véanse: *Gierbolini v. Employers Fire Ins. Co.*,

ante; *Valle v. Amer. Inter. Ins. Co.,* 108 D.P.R. 692 (1979). Ello no obstante, hemos indagado en las fuentes del derecho anglosajón, al igual que la Mayoría, *con el propósito de demostrar que aun bajo el sistema de derecho invocado por ésta, su decisión está errada.*

Tradicionalmente, y en relación con este aspecto del campo de los daños y perjuicios, en los Estados Unidos se ha extablecido la doctrina de "principal y agente" en la adjudicación de responsabilidad ante determinado acto negligente. Específicamente, los tribunales norteamericanos han utilizado la doctrina de *respondeat superior* para imponerle responsabilidad al principal o patrono por los actos negligentes de sus agentes o empleados. Bajo esta doctrina, se presume que el principal (patrono) tiene los medios y el poder de controlar los actos de sus empleados (agentes). Es decir, bajo tal doctrina el patrono responde en la medida en que tenga control sobre los actos negligentes de su empleado o agente.

*Respondeat superior* es, por lo tanto, una modalidad de la doctrina de "responsabilidad vicaria", en la cual el principal responde en la medida en que el acto en cuestión es llevado a cabo por el agente dentro del curso y ámbito de sus funciones. *Legal Medicine: Legal Dynamics of Medical Encounters*, American College of Legal Medicine, Saint Louis, The C.V. Mosby Co., 1988, pág. 73.

A la luz de tal doctrina, en el derecho angloamericano han surgido varias doctrinas aplicables a los casos de médicos, una de las cuales es la "doctrina del capitán del barco". Dicha doctrina surgió en Estados Unidos como resultado de que, previo a la década del 1940, las personas que sufrían daños a consecuencia de intervenciones quirúrgicas veían limitadas sus posibilidades de recibir compensación por la vía judicial. Ello así, pues bajo el estado de derecho vigente en esa época, las instituciones hospitalarias eran inmunes a este tipo de reclamación, puesto que llevaban a cabo obras de caridad que beneficiaban a toda la comunidad (*charitable immunity*). Además, su fragilidad económica y el temor de que una sola sentencia eliminase

del panorama a determinado hospital, era una amenaza real ante la importante función social ejercida por dichos hospitales. J.R. Yungtum, *The "Captain of the Ship" Sets Sail in Nebraska: Long v. Hacker*, 29 (Núm. 1) Creighton L. Rev. 379, 390–391 (1995).

Con el propósito de brindarle a los demandantes una posibilidad real de ser compensados, el Tribunal Supremo de Pennsylvania estableció la llamada "doctrina del capitán del barco" en el caso de *McConnell v. Williams*, 65 A.2d 243 (Pa. 1949). En dicho caso, el referido Foro judicial señaló que, bajo tal doctrina, es el cirujano quien responde por la negligencia de cualquier persona presente en la sala de operaciones, tal y como el capitán de un barco es responsable por todas las acciones de su tripulación.

Posteriormente, la inmunidad de los hospitales pasó a ser asunto del pasado; ello particularmente debido a que los hospitales comenzaron a proteger sus intereses mediante la obtención de seguros para sus empleados. Yungtum, ante, pág. 392, citando a S.H. Price, *The Sinking of the "Captain of the Ship": Reexamining the Vicarious Liability of an Operating Surgeon for the Negligence of Assisting Hospital Personnel*, 10 J. Legal Med. 323, 332 (1989). Ya para mediados de la década de los años cuarenta, la mayor parte de las jurisdicciones norteamericanas dejaron de aplicar la "doctrina del capitán del barco" *por considerarla pasada de moda e innecesaria su aplicación*, puesto que la doctrina ya no cumplía el cometido para el cual había sido desarrollada. Yungtum, ante, pág. 394. Resulta curioso señalar que la jurisdicción que originalmente dio vida a la "doctrina del capitán del barco", esto es, Pennsylvania, ha abandonado la misma y utiliza la doctrina del *borrowed servant*. *Thomas v. Hutchinson*, 275 A.2d 23 (Pa. 1971).(²)

---

(²) A su vez, el Tribunal Supremo de Texas específicamente ha señalado que desaprueba totalmente la "doctrina del capitán del barco". *Sparger v. Worley Hospital, Inc.*, 547 S.W.2d 582 (Tx. 1977).

Asimismo, el estado de Maryland abolió la "doctrina del capitán del barco" ante el cambio en la visión de los hospitales como instituciones de caridad. En *Franklin v. Gupta*, 567 A.2d 524 (Md. Ct. Spec. App. 1990), ese foro federal señaló que ya no existen razones económicas que justifiquen la imposición de responsabilidad vicaria

Bajo la doctrina de *master and servant* (teoría de agencia), un médico es responsable por la negligencia de *sus* empleados o "sirvientes", tratándose en la mayoría de los casos de *sus* enfermeras, asistentes o técnicos, a quienes el médico mismo es el que paga sus salarios y responden únicamente a las instrucciones de éste. Es decir, que un médico *no* responde vicariamente *a no ser que* su propio empleado o "sirviente" haya sido el causante de los daños en cuestión mientras se hallaba en el curso de su empleo. J. Talbot Young, Jr., *Separation of Responsibility in the Operating Room; The Borrowed Servant, the Captain of the Ship, and the Scope of Surgeons' Vicarious Liability*, 49 (Núm. 4) Notre Dame Law 933, 934 (1974).

Cuando el empleado tiene un solo patrono es muy fácil determinar quién tiene la "responsabilidad vicaria" por los actos del primero. Sin embargo, la situación se complica cuando, como en el caso de autos, la enfermera es empleada regular del hospital, pero el médico toma "prestados" sus servicios para determinada intervención quirúrgica. *A raíz de tal situación, en los Estados Unidos se desarrolló otra vertiente de la doctrina de "respondeat superior", conocida como el "sirviente prestado" (borrowed servant).* Contrario a la "doctrina del capitán del barco" —según la cual el cirujano es responsable por *todos* los actos negligentes que ocurran en la sala de operaciones por parte de cualquier persona allí presente— bajo la doctrina de *borrowed servant* esto *no* necesariamente es así.

La doctrina de *borrowed servant* consiste en que el principal o patrono le "presta" su agente o empleado a un tercero. No es determinante si dicho "préstamo" es gratuito o remunerado. *Legal Medicine: Legal Dynamics of Medical Encounters, op. cit.*, pág. 73. Si el segundo patrono —es decir, el médico en el caso ante nos— asume el *control ab-*

---

a los cirujanos para responderle a las víctimas de impericia médica. *Íd.*, pág. 538. El referido tribunal indicó que aunque un médico puede tener responsabilidad cuando toma prestado un empleado de otro, la decisión de *McConnell v. Williams*, 65 A.2d 243 (Pa. 1949), no debía ser vista como que le imponía responsabilidad *per se* a todos los cirujanos, sino que se le podía imponer responsabilidad basándose en la doctrina del *master and servant.*

*soluto* sobre dicho empleado, entonces este segundo patrono es quien responde por los actos negligentes cometidos por el empleado; esto es, lo determinante es decidir quién ejerce el control sobre tal empleado al momento del acto negligente. Sin embargo, si se determina que ambos patronos ejercían igual control sobre el empleado, entonces ambos patronos son responsables. Íd.

Lo antes señalado constituye una de las razones por las cuales no podemos estar de acuerdo con la postura acogida por la mayoría de este Tribunal de imponerle responsabilidad al doctor Carlo Font por los actos negligentes de la enfermera, *empleada del hospital,* simplemente porque ella estuvo bajo la *supervisión temporal* del referido galeno. Es un hecho innegable que el doctor contó con los servicios de dicha enfermera durante la intervención quirúrgica. *Sin embargo, durante tal período de tiempo la enfermera no cesó de ser empleada del hospital.* Era el hospital el que pagaba por sus servicios, el que determinaba su horario de trabajo, el que evaluaba sus servicios y el que tenía el derecho a retenerla o a despedirla. *Más aún, fue el hospital el responsable de verificar sus credenciales al momento de contratar sus servicios y el que tenía el deber de adiestrarla en forma óptima conforme a los deberes y las obligaciones propios de su puesto.* No podemos perder de vista que el cirujano *no* escoge al personal que le asiste en las intervenciones quirúrgicas que realiza en determinado hospital.

Por el mero hecho de que la enfermera le prestara sus servicios temporalmente al doctor, ésta no cesaba de responderle directamente al hospital. Véanse: *Foster v. Englewood Hospital Association,* 313 N.E.2d 255 (1974); *Olander v. Johnson,* 258 Ill. App. 89 (1930). Entendemos que resultan muy sabias las expresiones formuladas en el citado caso de *Olander,* ante, a los efectos de que:

Generally, an operating surgeon is not legally responsible for the mistake of a nurse, not his employee, where an operation is

performed at a hospital not owned or controlled by the surgeon.([3])

*Pero, hay más.* Procede que se enfatice el hecho de que en la jurisdicción norteamericana se ha hecho una distinción entre los actos o funciones realizadas por las enfermeras, denominadas como "administrativos", y otros denominados como "médicos" o que envuelven algún juicio o destreza médica. Así, se ha entendido que los cirujanos responden por la negligencia en que pueda incurrir una enfermera en el desempeño de sus funciones "médicas", mientras que el cirujano no responde por la negligencia acaecida durante el desempeño de sus funciones "administrativas", *pues respecto a ese tipo de funciones está actuando como empleada del hospital.* Véanse: 61 Am. Juris 2d Sec. 288, pág. 438 (1981); *Rural Educational Associa-*

---

([3]) En el caso de *Olander v. Johnson*, 258 Ill. App. 89 (1930), al demandante se le removió su apéndice e inadvertidamente se le dejó una gasa dentro de la cavidad abdominal. El doctor había realizado una inspección ocular del área intervenida del paciente, no hallando gasa o material extraño alguno. Además, solicitó de las enfermeras un conteo de los materiales, quienes le informaron que el conteo era correcto. Las partes en el caso aceptaron que el cirujano tiene el deber de dedicar toda su atención a la operación y que se afectaría la vida del paciente si el cirujano sacara, además, tiempo para contabilizar las gasas utilizadas y removidas. El tribunal resolvió que era indisputable que la operación en el caso se realizó conforme a las reglas y costumbres establecidas por el hospital y que el doctor se aseguró de que las reglas de la institución relativas al conteo de gasas se siguieron cuidadosa y correctamente. El mencionado tribunal determinó, además, que el hecho de que una de las enfermeras cometiera un error no era culpa del cirujano y que éste se cometió no obstante las precauciones tomadas. Se enfatizó que el cirujano solicitó el conteo, examinó el área y todo lucía bien; además, siguió todos los métodos aprobados para examinar a un paciente luego de una operación. El referido tribunal concluye indicando:

"In short, just as a rule making a surgeon liable for every negligent act of every hospital employee under his control is too harsh, a rule exculpating him for every negligent act of persons under his control simply because they are not his employees is lenient." *Olander v. Johnson*, ante, pág. 261.

En el caso de *Foster v. Englewood Hospital Association*, 313 N.E.2d 255, 260 (1974), se dijo que "[a] nurse is still subject to the rules and regulations of the hospital, and the doctor may not gainsay them. She may be discharged by the hospital but not by the doctor. The hospital, not the doctor, furnishes the equipment that the nurse uses, and she is paid by the hospital. *We conclude, therefore, that the employees of the hospital assisting a surgeon remain the employees of the hospital even though the surgeon retains some degree of control over them*". (Citas omitidas y énfasis suplido.)

*tion v. Bush*, 298 S.W.2d 761 (1957); *Buzan v. Mercy Hospital, Inc.*, 203 So. 2d 11 (Fla. 1967). Específicamente, los hospitales responden por la negligencia de sus enfermeras al realizar "funciones administrativas", las cuales aun cuando son esenciales para el bienestar del paciente y el éxito de la operación, no requieren el uso de técnicas o de conocimientos especializados médicos o periciales. *Swigerd v. City of Ortonville*, 75 N.W.2d 217 (Minn. 1956).

El caso de *Buzan v. Mercy Hospital, Inc.*, ante, resulta ilustrativo. En éste se demandó a un cirujano y al hospital, puesto que durante una operación al demandante se le dejó un cuerpo extraño dentro de su abdomen. El tribunal pasó a considerar si la enfermera que ayudó al cirujano en la operación y quien realizó el conteo de materiales era una empleada (*servant*) del hospital o era un *borrowed servant* del cirujano. *Se reconoció la necesidad de realizar una distinción entre el tipo de servicio o acto atribuido a la enfermera del hospital al ayudar en una operación.* El referido tribunal indicó lo siguiente:

> Basically, duties of such an assisting nurse which involve professional skill or decision are regarded as controlled solely by the surgeon or doctor. On the other hand, in performing services or acts not involving professional skill or decision, *and which are ministerial in character*, a hospital nurse assisting a surgeon is not regarded as his borrowed servant. *A sponge count by an assisting nurse generally is held to be in the latter category.* (Énfasis suplido.)(4) *Buzan v. Mercy Hospital, Inc.*, ante, pág. 13.

---

(4) Debe mantenerse presente que la mayoría de los tribunales norteamericanos que han encontrado a los médicos responsables por la negligencia de otras personas que están presentes en la sala de operaciones o que han utilizado la "doctrina del capitán del barco", no han hecho otra cosa que aplicar la doctrina de *res ipsa loquitur. Rudeck v. Wright*, 218 Mont. 41, 709 P.2d 621 (Mont. 1985); *Burke v. Washington Hospital Center*, 475 F.2d 364 (Cir. D.C. 1973); *Ales v. Ryan*, 8 Cal. Rptr.2d 82 (1936); *Shannon v. Jaller*, 6 Ohio App.2d 206, 217 N.E.2d 234 (1966); *Ybarra v. Spangard*, 25 Cal. Rptr.2d 486 (Cal. 1944).

Al igual que en el caso de autos, la mayoría de estos casos de impericia están relacionados con haber dejado gasas u otros objetos extraños en el cuerpo de los pacientes al hacer una intervención quirúrgica. A los médicos se les ha impuesto responsabilidad porque su negligencia se puede inferir por el solo hecho de que el paciente tenga un cuerpo extraño luego de la operación. *Ahora bien, si se aplica la teoría de res ipsa loquitur, la negligencia es directa, no vicaria, y el médico puede probar lo contrario.* Véanse: *Martin v. Perth Amboy General Hospital*, 104 N.J.

Es a la luz de los señalamientos anteriores que *disentimos* de la opinión de la mayoría de este Tribunal. La negligencia en el caso de autos fue *exclusivamente* de la enfermera al ésta no llevar un conteo adecuado de los instrumentos y materiales utilizados en la intervención quirúrgica, *función que es puramente administrativa o ministerial por la cual debe responder su patrono, el hospital.*

## II

Aplicando al caso de autos todo lo anteriormente señalado, somos del criterio que no procede otra conclusión que no sea la de que el hospital es el responsable del acto negligente en que incurrió su empleada, *la enfermera Norma Arroyo,* y no, como erróneamente concluye la Mayoría, el doctor Carlo Font.

Como, inclusive, surge de la propia opinión mayoritaria emitida por el Tribunal, en la intervención quirúrgica que se le practicara a la codemandante Toro, estaba presente una enfermera —empleada del Estado Libre Asociado de Puerto Rico— que *específicamente* tenía a su cargo, entre otras funciones, el conteo de los instrumentos quirúrgicos y gasas que fueron utilizadas en la misma por el cirujano. Al "terminar" la operación, y antes de proceder a suturar a la paciente, el cirujano —el Dr. Jorge Carlo Font— específicamente requirió de la enfermera —la Sra. Norma Arroyo— el conteo de los instrumentos y gasas utilizadas en la misma; ello con el obvio propósito de evitar precisamente lo sucedido, esto es, que quedara en la cavidad abdominal algún instrumento o gasa. Dicha enfermera le aseguró al cirujano que todos los instrumentos y gasas utilizadas en

---

Super. 335, 250 A.2d 40 (N.J. Super. 1969); *Sanzari v. Rosenfeld,* 34 N.J. Super. 128, 140 (1961); *Davis v. Kerr,* 239 Pa. 351, 86 A. 1007 (1913).

Sobre este último aspecto nos unimos a lo resuelto por varios tribunales americanos, al efecto de que el médico cirujano *no* será responsable por dejar objetos extraños en el cuerpo de pacientes si ejercitó un grado razonable de cuidado para prevenir que ello no ocurriera, y que no puede ser responsable por el hecho de que, en efecto, se quedó una gasa en el cuerpo del paciente. *Miller v. Tongen,* 281 Minn. 427, 161 N.W.2d 686 (1968); *Rayburn v. Day,* 126 Or. 135, 268 P. 1002 (1928).

la operación estaban fuera del cuerpo de la paciente.[5] No conforme con la referida aseveración de parte de la enfermera Arroyo, el doctor Carlo Font examinó el cuerpo de la paciente, no detectando ningún instrumento o gasa, luego de lo cual procedió a suturar a la paciente.

En otras palabras, y dicho de la manera más sencilla, el doctor Carlo Font ejercitó durante la intervención quirúrgica *todo* el cuidado que se le puede exigir a un cirujano en esta clase de situaciones. Esto es, el mencionado codemandado, *en ese momento*, ofreció a su paciente la atención médica que, a la luz de los modernos medios de comunicación y enseñanza, y conforme el estado de conocimiento de la ciencia y práctica prevaleciente en la medicina, satisface las exigencias generalmente reconocidas por la propia profesión médica. *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988). *No* debemos perder de vista, *repetimos*, que un cirujano, durante el transcurso de una operación, *no* puede estar pendiente de, y contando, cuántas gasas son utilizadas en la misma, tanto por él como por alguno de sus ayudantes.

Si se le exige la mencionada responsabilidad, no existe razón alguna por qué no exigirle, a manera de ejemplo, que esté cotejando, *personal y continuamente*, cuánta anestesia se le está suministrando al paciente y cuáles son las pulsaciones por minuto del corazón, así como cuál es la presión arterial del paciente. Ello le compete al anestesiólogo que atiende la operación, estando necesariamente obligado el cirujano a confiar en la información que aquél le brinda. No entendemos cómo puede este Tribunal establecer, en esta era de adelantos de la medicina en que vivimos, la norma a los efectos de que estamos ante una "omisión de carácter grave" de parte del cirujano. Ello, repetimos, es de la incumbencia del personal de apoyo existente en las salas de operaciones.

Esta visión de la Mayoría ignora las técnicas modernas

---

[5] A esos efectos, dicha enfermera firmó una certificación luego de terminada la intervención, lo cual es un requisito con el que se tiene que cumplir en esos casos.

en esta área de la medicina. Podemos tomar conocimiento judicial del hecho de que hoy en día se llevan a cabo intervenciones quirúrgicas en las cuales un cirujano es el que hace la incisión inicial en el cuerpo del paciente, otro es el que lleva a cabo la delicada intervención quirúrgica propiamente, y otro es el que sutura. Ello se hace, de ordinario, con el propósito de que ese cirujano especializado pueda intervenir en múltiples operaciones durante el mismo día, no estando presente éste ni cuando "comienza" la operación ni cuando "termina" la misma. Dicha situación, como es sabido, es característica de las operaciones de corazón abierto. Procede que uno se pregunte: si se queda, dentro del cuerpo del paciente, una gasa durante una de esas operaciones, ¿cuál es el cirujano que responde? ¿El que hace la incisión inicial, el que realiza la intervención quirúrgica especializada, el que sutura o todos ellos, a pesar del hecho de que existe la posibilidad de que, al "terminarse" la operación, alguno de ellos no esté físicamente presente en el quirófano?

¿No resulta, en consecuencia, más sensato establecer la norma a los efectos de que es responsabilidad del personal de apoyo la corrección del conteo de los instrumentos y materiales quirúrgicos que se utilizan durante una operación, labor que no requiere conocimiento o destreza médica alguna?

## III

No obstante lo anteriormente señalado, debemos reconocer que los médicos recurrentes fueron negligentes en el *tratamiento post operatorio* que le brindaron a la codemandante Toro Aponte al no percatarse de la posibilidad de que a ésta se le hubiera dejado una gasa en su abdomen y/o al no ordenar que se le realizaran, a tiempo, los exámenes correspondientes y usuales en esta clase de casos; negligencia que, con toda probabilidad, agravó de manera innecesaria la condición de dicha persona y, por consiguiente,

los daños físicos y angustias mentales que sufrió la referida codemandante.

En otras palabras, somos de la opinión que, *en esta etapa de lo ocurrido*, los médicos recurrentes *no* le ofrecieron a su paciente la atención médica que, a la luz de los modernos medios de comunicación y enseñanza, y conforme el estado de conocimiento de la ciencia y práctica prevaleciente en la medicina, satisface las exigencias generalmente reconocidas por la propia profesión médica. *Rodríguez Crespo v. Hernández*, ante.

Contrario a la mayoría de los integrantes del Tribunal, sin embargo, somos del criterio que los por cientos de negligencia que determinó como procedentes el foro de instancia deben ser invertidos. Esto es, somos de la opinión que la enfermera condemandada y su patrono el hospital deben responder por el setenta y cinco (75) por ciento de los daños decretados y los médicos recurrentes en un veinticinco (25) por ciento.

Es por todo ello que disentimos.