Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| KEDWIN MIGUEL ROMERO<br><br>Demandante-Apelado<br><br>v.<br><br>AUTORIDAD DE ENERGÍA ELÉCTRICA; ASOCIACIÓN DE RESIDENTES DE LA VILLA DE TORRIMAR<br><br>Demandado-Apelante | KLAN202400531 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm. BY2019CV00054<br><br>Sala: 503<br><br>Sobre: DAÑOS Y PERJUICIOS |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y el Juez Cruz Hiraldo.

Cruz Hiraldo, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 6 de agosto de 2025.

Comparece la parte apelante, Autoridad de Energía Eléctrica de Puerto Rico para solicitar la revocación de la Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Bayamón en la cual declaró con lugar la demanda del epígrafe. El tribunal ordenó a la parte apelante el pago de $37,800 al apelado, el señor Kedwin Miguel Romero, en concepto de daños físicos y emocionales, y $5,000 en honorarios de abogado por temeridad.

Por los fundamentos que expondremos a continuación, *confirmamos* la Sentencia apelada y *modificamos* la cuantía de honorarios de abogados impuesta por el foro primario.

-*I*-

El 3 de enero de 2019, la parte apelada presentó una demanda en contra de la parte apelante y la Asociación de Residentes de Villa de Torrimar. Reclamó el resarcimiento de los daños ocasionado por un accidente ocurrido mientras cortaba

grama en la Urbanización Villa de Torrimar. El siniestro ocurrió cuando el pie del apelado hizo contacto con un cable ubicado en una toma de corriente circular sin cubierta, "la cual a su vez está identificada con letras de la AEE". La parte apelante presentó *Contestación a la Demanda* y negó las alegaciones. La Asociación de Residentes de la Villa de Torrimar también sometió su alegación responsiva.

Superadas varias incidencias procesales ocasionadas por la falta de diligencia de la parte apelante, el 17 de junio de 2021 esta compareció mediante nueva representación legal. Tras varios intentos infructuosos para culminar el descubrimiento de prueba, el 9 de mayo de 2022 el foro primario, por segunda vez, colocó al apelante en estado de rebeldía. Empero, el 23 de junio de 2022, el foro de primera instancia *motu proprio* reconsideró la anotación de rebeldía y ordenó al apelante a mostrar causa por la cual no debía mantenerla. El 29 de junio de 2022, la parte apelante presentó *Moción en Cumplimiento de Orden para Mostrar Causa y Consignando Sanciones*. Superado el asunto, el foro primario decidió continuar con el pleito en el trámite ordinario. El 6 de octubre de 2022 durante la Conferencia con Antelación al Juicio las partes estipularon los siguientes hechos y prueba documental:

1. Los hechos materiales de este caso se desarrollaron el día 25 de julio de 2018.

2. Para la fecha de los hechos la parte demandante tenía 19 años.

3. Para la fecha de los hechos la parte demandante trabajaba como empleado de Synergy Horticulture, LLC.

4. Por los hechos materiales de este caso el demandante recibió atención médica a través de la Corporación del Fondo de Seguro de Estado (en adelante "CFSE").

5. Se estipuló la autenticidad y contenido del expediente médico de la parte demandante en la Corporación del Fondo del Seguro del Estado.

El 22 de agosto de 2023 las partes comparecieron a la vista del juicio en su fondo. Estipularon cierta evidencia fotográfica y el

expediente médico del apelado de la Corporación del Fondo del Seguro del Estado. El 26 de octubre de 2023 el tribunal notificó la sentencia apelada en la cual consignó las siguientes determinaciones de hechos:

1. Sobre la persona del demandante:

    a. En la actualidad el demandante tiene 24 años, reside en el estado de Illinois, en donde trabaja en una fábrica operando un "fork lift".

2. Sobre los hechos del caso:

    a. Los hechos ocurrieron el 25 de julio de 2018 en la Urbanización La Villa de Torrimar de Guaynabo.

    b. Para la fecha de los hechos el demandante tenía 19 años y trabajaba para la empresa Synergy Horticulture, LLC.

    c. Para la fecha de los hechos Synergy Horticulture, LLC, ofrecía servicios de mantenimiento a las áreas verdes de la Urbanización La Villa de Torrimar.

    d. El día de los hechos el demandante estaba pasando trimmer en las áreas verdes aledañas a uno de los parques de la mencionada urbanización.

    e. Mientras pasaba el trimmer la pierna izquierda del demandante cayó en un hueco que no era perceptible a la vista porque estaba totalmente tapado por la grama.

    f. El demandante intentó sacar su pierna del hueco, pero al hacer esto comenzó a escuchar sonidos de chispas de electricidad proveniente del suelo; al dirigir su mirada al hueco el demandante observó chispas en el hueco, sintió miedo, intentó sacar la pierna y fue entonces cuando escuchó el estruendo de una explosión.

    g. Como resultado de la explosión el demandante quedó "fuera de sí". Al recuperar la conciencia observó que, del lado de su pierna izquierda, su pantalón y media estaban incendiados y que su bota estaba botando humo.

    h. Embargado por el miedo el demandante intentó apagar el fuego con sus manos y se quitó la bota; tras quitarse la bota el demandante observó que tenía la parte inferior de su pierna izquierda color negro, que tenía quemaduras, que su piel expedía humo y que del área afectada estaba emanando un líquido amarillento.

    i. Después de la ocurrencia del accidente el demandante se percató que su pierna había caído en un hueco perteneciente a la AEE, que el hueco estaba cubierto de basura, grama y

hojas; también percibió que el hueco carecía de una tapa, que tenía en su interior una serie de cables "pelados", así como unas cajas negras.

j.  Antes de la ocurrencia del evento el demandante había visto huecos similares en las áreas verdes de la urbanización y los había denunciado; después de la ocurrencia del evento el demandante regresó al área donde ocurrió el accidente y observó que el hueco donde había caído ahora tenía una tapa verde y redonda, que tenía las siglas de la AEE y que incluso identificaba el voltaje de la cablería.

k.  Luego del accidente el demandante permaneció en los predios de la urbanización por espacio de dos horas y media, esperando que sus compañeros culminaron el trabajo; destacó el demandante que no pudo abandonar los predios de La Villa de Torrimar porque no tenía transportación propia, ya que había llegado allí en el vehículo de la compañía.

l.  En ese periodo de tiempo que estuvo esperando porque sus compañeros terminaran el trabajo el demandante observó como la condición de su pie se empeoraba; abundando sobre el particular el demandante declaró que observó como su pierna se inflamaba, que la piel se le ponía blanca y que de las heridas emanaba un líquido amarillento.

m.  Al abandonar las facilidades de la urbanización los compañeros de trabajo del señor Romero lo llevaron a su residencia en Ciales, en donde el demandante se bañó y esperó a que sus padres llegaran, el demandante describió el camino hasta Ciales como uno doloroso e incómodo ante los traumas que presentaba.

n.  Al cabo de dos horas de espera la madre del demandante llegó a la residencia y lo llevó de inmediato a la sala de emergencias del pueblo de Ciales.

3.  Sobre el tratamiento médico del demandante:

a.  En la sala de emergencias al demandante le limpiaron las heridas con gazas, proceso que fue descrito por el señor Romero como uno extremadamente doloroso.

b.  Allí también le cortaron con tijeras los pedazos de piel que estaban muertos y le aplicaron una serie de cremas.

c.  El demandante declaró que mientras estuvo en la sala de emergencias llegó a pensar que habría de perder la pierna.

d.  En la sala de emergencias al demandante le hicieron entrega de unas muletas.

e.  Al confrontársele con la fotografía contenida en el folio nueve (9) de lo que fue marcado como el Exhibit II, el demandante explicó que la piel muerta le fue removida con una especie de

esponja que las enfermeras le frotaron en círculos en el área afectada.

f. En la sala de emergencias le aplicaron una serie de cremas de color blanco, vendajes y unas mallas.

g. Después de varias horas, el demandante fue dado de alta de la sala de emergencias con instrucciones de aplicarse unas cremas y mantener el área limpia; esa noche del accidente, después de la sala de emergencias, el señor Romero se retiró a su hogar para intentar descansar, cosa que fue imposible por el intenso dolor que sentía.

h. Al día siguiente el demandante encontró la condición de su pierna incluso peor que el día del accidente; observó el señor Romero que su pierna estaba aún más hinchada y que las heridas habían comenzado a cambiar de color y se estaban tornando verdes.

i. Conforme a las instrucciones que se le impartieran el demandante mantuvo sus heridas limpias, lavándolas con frecuencia y aplicándoles las cremas que le fueran recetadas; el señor Romero explicó que estos procesos de curación eran sumamente dolorosos.

j. El demandante describió la condición de su pierna izquierda en los días subsiguientes como "crítica", toda vez que no podía apoyarla. En los días posteriores a la ocurrencia del accidente, el demandante se vio forzado a mantener estricto reposo en cama, dependía de su madre para alimentación, limpieza de la herida y para que lo asistiera en el proceso del baño.

k. El 30 de julio de 2018 el demandante visitó las facilidades del Hospital Industrial en el Centro Médico de Puerto Rico.

l. Al llegar a las facilidades del Hospital Industrial el personal médico que lo atendió encontró la herida infectada y procedieron a hospitalizarlo.

m. En total el señor Romero estuvo veintidós (22) días ingresado en el Hospital Industrial.

n. En esos veintidós (22) días de hospitalización el demandante fue sometido a diez (10) pruebas de sangre y laboratorios, cuatro (4) cultivos bacteriológicos de las heridas, tres (3) estudios de imágenes y cuatro (4) terapias ocupacionales.

o. En esas tres (3) semanas de hospitalización el demandante fue sometido en las mañanas y las tardes, diariamente, a procesos de curetaje y limpieza de las heridas, consistentes en debridaciones con gaza.

p. Después de ser sometido a los curetajes el demandante era forzado a caminar por los pasillos del hospital por espacio de una (1) hora. Ello le generaba al demandante mucho dolor

puesto que lo obligaban a caminar sin muletas y a apoyar el pie que se encontraba inflamado.

q. El demandante pasó prácticamente toda la hospitalización solo, ya que no permitían visitantes en el área en la que estaba recluido. Conforme con las políticas del hospital el demandante solo podía recibir visita dos (2) veces en semana y solo por espacio de una (1) hora.

r. Durante su hospitalización apenas pudo ver a su familia, por la distancia geográfica entre Ciales y San Juan, y por el tiempo limitado autorizado por el hospital para visitas.

s. Este aislamiento, unido al dolor que sentía en el área afectada, hizo sentir al señor Romero sin ánimos, sin motivación; es por esta razón que el demandante, durante el curso de la hospitalización, requirió asistencia con una terapeuta.

t. Después de veintidós (22) días el demandante fue dado de alta, pero aún su pierna continuaba afectada y con limitaciones. En cuanto a las heridas se refiere las mismas no habían terminado de crear piel, por lo que el demandante estuvo obligado a mantenerlas cubiertas con cremas, vendajes y mallas.

u. El periodo de convalecencia en el hogar presentó para el demandante una mejoría porque estaba fuera del entorno hospitalario, rodeado de sus familiares. No obstante, el demandante estuvo con el ánimo decaído ya que no podía regresar a su rutina de trabajo, salidas y juegos como joven de su edad.

v. El demandante recuperó su movilidad sin limitaciones, sin dolor, después de tres (3) semanas de convalecencia en su hogar.

4. Sobre la condición actual del demandante:

a. Al día de hoy el demandante se siente bien, su pierna ha regresado a la normalidad.

b. Como resultado del accidente el demandante desarrolló fobia a todo aquello que conlleva electricidad.

El tribunal apelado declaró "con lugar" la demanda de título. Ordenó al apelante el pago de $37,800 al apelado en concepto de daños físicos y emocionales, y $5,000 en honorarios de abogado por temeridad. El foro primario denegó la reconsideración presentada por la parte apelante. Inconforme con tal determinación, la parte apelante presentó el recurso de apelación ante nuestra consideración, señala los siguientes errores:

Erró el TPI al negarse a emitir como determinación de hecho adicional que, con anterioridad a los hechos del caso, el apelado conocía de la existencia de huecos – parecidos al hueco en el que cayó su pierna y alegada situación de peligrosidad- en las áreas verdes de villa.

Erró el TPI al negarse a emitir como determinación de hecho adicional que, con anterioridad a los hechos de este caso, el apelado había notificado la situación de peligrosidad a personas identificadas con la Villa y/o ARVT.

Erró el TPI al negarse a emitir como determinación de hecho adicional que, a pesar de que, con anterioridad a los hechos de este caso, el apelado había notificado en varias ocasiones de la existencia de huecos- parecidos al hueco en el que cayó su pierna y alegada situación de peligrosidad – en las áreas verdes de la villa, la misma no había sido remediada por la ARVT;

Erró el TPI al negarse a emitir como determinación de hecho adicional que, a pesar de conocer de la existencia de huecos- parecidos al hueco en el que cayó su pierna y alegada situación de peligrosidad – en las áreas verdes de la villa, con anterioridad a los hechos de este caso, el Sr. Romero no ejerció un grado mayor de diligencia y cuidado mientras transcurría por las áreas verdes de la villa.

Erró el TPI al negarse a emitir como determinación de hecho adicional que, antes del accidente, el apelado no había visto ese hueco y desconocía que le perteneciera a la AEE.

Erró el TPI al negarse a emitir como determinación de hecho adicional que, el apelado no presentó prueba que demostrara que el hueco dónde el apelado cayó con su pierna le perteneciera a la AEE.

Erró el TPI al negarse a emitir como determinación de hecho adicional que, el apelado no presentó prueba que demostrara que la AEE conocía de la condición de peligrosidad; que esta llevaba un tiempo así, y que nada hizo al respecto.

Erró el TPI al negarse a emitir como determinación de hecho adicional que, la ARVT es cocausante del daño en la medida que fue alertada por el apelado de la existencia de huecos-parecidos al hueco en el que cayó su pierna y alegada situación de peligrosidad – en las áreas verdes de la villa, con anterioridad a los hechos de este caso, más nada hicieron para remediar la situación de peligrosidad o, de alguna forma alertar al apelado, sobre la existencia de estos.

Erró el TPI al determinar que mientras pasaba el trimmer la pierna izquierda del apelado cayó en un hueco que no era perceptible a la vista porque estaba totalmente tapado por la grama.

Erró el TPI al determinar que después de la ocurrencia del accidente el apelado se percató que su pierna había caído en un hueco perteneciente a la AEE, que el hueco estaba cubierto de basura, grama y hojas; también percibió que el hueco carecía de una tapa, que tenía en su interior una serie de cables "pelados", así como unas cajas negras.

Erró el TPI al determinar que antes de la ocurrencia del evento el apelado había visto huecos similares en las áreas

verdes de la urbanización y los había denunciado; después de la ocurrencia del evento el apelado regresó al área donde ocurrió el accidente y observó que el hueco donde había caído ahora tenía una tapa verde y redonda, que tenía las siglas de la AEE y que incluso identificaba el voltaje de la cablería.

Erró el TPI al determinar que la AEE desplegó una conducta de dejadez y desatención que afectó el manejo del caso y, en consecuencia, imponer honorarios por temeridad a la AEE sin considerar la contribución del apelado a cualquier dilación en la tramitación del caso.

La parte apelada también compareció mediante alegato escrito. Las partes estipularon la transcripción de la prueba oral. Por tanto, procedemos a resolver con el beneficio de la comparecencia de las partes, la transcripción de la prueba oral y el contenido del expediente.

*-II-*

*-A-*

Para la fecha de los hechos, la responsabilidad civil por negligencia emanaba del Artículo 1802 del Código Civil de 1930, 31 LPRA sec. 5141, disponía en su parte pertinente que, "el que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado".[1] La imposición de responsabilidad civil bajo esta norma jurídica requiere que, concurran tres elementos: (1) se establezca la realidad del daño sufrido; (2) exista la correspondiente relación causal entre el daño y la acción u omisión de otra persona; y (3) el acto u omisión sea culposo o negligente. *Tormos Arroyo v. D.I.P.*, 140 DPR 265, 271 (1996). La negligencia consiste en no precaver las consecuencias lógicas de una acción u omisión que cualquier persona prudente hubiese previsto bajo las mismas circunstancias. *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465 (2022); *Pérez et al. v. Lares Medical et al.*, 207 DPR 965, 976 (2021); *López v. Porrata Doria*, 169 DPR 135, 151-152, 164 (2006).

---

[1] El Artículo 1536 del Código Civil de 2020 dispone de similar manera al leer: "La persona que por culpa o negligencia causa daño a otra, viene obligada a repararlo".

El Artículo 1058 del Código Civil de 1930, 31 LPRA sec. 3022, establecía:

> Fuera de los casos expresamente mencionados en la ley, y de los en que así lo declare la obligación, nadie responderá de aquellos sucesos que no hubieran podido preverse, o que, previstos, fueran inevitables.

Sobre el particular, el Tribunal Supremo explicó:

> La previsibilidad es un elemento esencial para determinar tanto el acto negligente como la relación causal entre éste y el daño reclamado. Por eso, para que ocurra un acto negligente "es suficiente que el actor haya previsto que su conducta probablemente resultaría en daños de alguna clase a alguna persona aunque no hubiese previsto las consecuencias particulares o el daño específico que resultó, ni el mecanismo particular que lo produjo, ni la persona específica del perjudicado.
>
> *López v. Porrata Doria, supra*, pág. 154.

La culpa o negligencia es la falta del debido cuidado, consiste en no anticipar y prever las consecuencias racionales de un acto, que una persona prudente habría de prever en las mismas circunstancias. Mena *Pamias v. Jiménez Meléndez*, 212 DPR 758, 768 (2023); *Toro Aponte v. E.L.A.*, 142 DPR 464 (1997). En Puerto Rico rige la doctrina de la causalidad adecuada, la cual establece que "no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general". *Pérez et al. v. Lares Medical et al.*, supra, págs. 976–977; *López v. Porrata Doria, supra*, págs. 151–152; *Soc. de Gananciales v. Jerónimo Corp.*, 103 DPR 127, 134 (1974).

En materia de responsabilidad civil extracontractual, el hecho productor del daño nunca se presume. *Colón v. K-Mart*, 154 DPR 510, 521 (2001). La mera ocurrencia de un accidente no genera inferencia alguna de negligencia, ni exime al demandante del peso de demostrar la realidad del daño sufrido, la existencia de un acto u omisión negligente, y el elemento de causalidad. *Bacó Administrador del F.S.E. v. Almacén Ramón Rosa*, 151 DPR 711, 724-725 (2000). El que alegue haber sufrido un daño por la

negligencia de otro debe poner al tribunal en condiciones de poder hacer una determinación clara y específica sobre negligencia mediante la presentación de prueba a esos efectos. *Íd.*, pág. 725.

*-B-*

Al determinar si se incurrió o no en responsabilidad civil resultante de una omisión, los tribunales deben considerar varios factores: (i) la existencia o inexistencia de un deber jurídico de actuar por parte del alegado causante del daño y (ii) si de haberse realizado el acto omitido se hubiera evitado el daño. *Soc. Gananciales v. G. Padín Co., Inc.*, 117 DPR 94, 106 (1986). El primero facto, la ocurrencia de una omisión "sólo [da] lugar a una causa de acción en los casos en que exista un deber de actuar". *Elba A.B.M. v. U.P.R.*, *supra*, pág. 308; Véase, J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1983, T. 2, Vol. 3, pág. 80. Una omisión genera responsabilidad civil cuando constituya una "conducta antijurídica imputable". *Arroyo López v. E.L.A.*, 126 DPR 682, 686 (1990).

Para incurrir en negligencia, resultado de una omisión, debe existir un deber de cuidado impuesto o reconocido por ley y el quebrantamiento de ese deber. H.M. Brau Del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986, Vol. I, pág. 173. Esto es, "si la omisión del alegado causante del daño quebranta un deber impuesto o reconocido por ley de ejercer, como lo haría un hombre prudente y razonable, aquel grado de cuidado, diligencia, vigilancia y precaución que las circunstancias le exigen". *Arroyo López v. E.L.A.*, *supra*, pág. 686. Ante "una reclamación fundada en responsabilidad por omisión, la pregunta de umbral es si existía un deber jurídico de actuar de parte del alegado causante del daño". *Arroyo López v. E.L.A.*, *supra*, págs. 686–687. El deber de cuidado incluye tanto la obligación de anticipar, como la de evitar

la ocurrencia de daños cuya probabilidad es razonablemente previsible. "[L]a regla de anticipar el riesgo no se limita a que el riesgo preciso o las consecuencias exactas arrostradas debieron ser previstas". *Elba A.B.M. v. U.P.R.*, 125 DPR 294, 309 (1990). Lo esencial es prever en forma general consecuencias de determinada clase. *Íd.* Sin la existencia de este "deber de cuidado mayor" no puede responsabilizarse a una persona porque no realizó el acto de que se trate. *Ramírez v. E.L.A.*, 140 DPR 385, 394 (1996).

La relación causal entre el daño causado y la omisión negligente existe cuando "de haberse realizado el acto omitido se hubiere evitado el daño". *Soc. Gananciales v. G. Padín Co., Inc.*, *supra,* pág. 106. En ese sentido "[n]o es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general". *Soc. de Gananciales v. Jerónimo Corp.*, 103 DPR 127, 134 (1974). Un daño podrá ser considerado como el resultado probable y natural de un acto u omisión negligente si luego del suceso, si en retrospectiva, parece ser la consecuencia razonable y común de la acción u omisión de que se trate. *Montalvo v. Cruz, supra,* págs. 756–757.

**-C-**

Como principio general, dentro del derecho probatorio, cuando no existan circunstancias extraordinarias, o indicios de pasión, prejuicio, parcialidad o error manifiesto, la apreciación de la prueba realizada por el Tribunal de Primera Instancia merece deferencia y respeto por parte de este Tribunal. *Hernández Maldonado v. Taco Maker,* 181 DPR 281, 289 (2011); *Miranda Cruz y otros v. SLG Ritch,* 176 DPR 951, 974 (2009); *Argüello v. Argüello,* 155 DPR 62, 78-79 (2001).

En cuanto a la prueba oral en las revisiones judiciales, la adjudicación de credibilidad de un testimonio vertido ante el tribunal de primera instancia "es merecedora de gran deferencia

por parte del tribunal apelativo por cuanto es ese juzgador quien está en mejor posición para aquilatar la prueba testifical desfilada ya que él fue quien oyó y vio declarar a los testigos". *Argüello v. Argüello, supra*, pág. 78; *Pueblo v. Bonilla Romero*, 120 DPR 92, 111 (1987). Solo el juez de primera instancia tiene la oportunidad de ver al testigo declarar, escuchar su testimonio en vivo y evaluar su "*demeanor*". *Ramos Acosta v. Caparra Dairy, Inc.*, 113 DPR 357, 365 (1982).

### -D-

Las Reglas 104 y 105 de Evidencia, 32 LPRA Ap. VI, establecen el procedimiento ante la admisión o exclusión errónea de evidencia. La Regla 104(a) de Evidencia requiere que la parte perjudicada por la admisión errónea de evidencia presente una objeción "oportuna, específica y correcta" o una moción que solicite que se elimine del récord, de surgir con posterioridad el fundamento para su exclusión. Sobre el efecto que tendrá el error en la admisión o exclusión de evidencia, la Regla 105(a) de Evidencia indica:

> (a) Regla general. No se dejará sin efecto una determinación de admisión o exclusión errónea de evidencia ni se revocará por ello sentencia o decisión alguna a menos que:
>
> > (1) La parte perjudicada con la admisión o exclusión de evidencia hubiere satisfecho los requisitos de objeción, fundamento u oferta de prueba establecidos en la Regla 104 de este apéndice, y
> >
> > (2) el tribunal que considera el señalamiento estime que la evidencia admitida o excluida fue un factor decisivo o sustancial en la sentencia emitida o decisión cuya revocación se solicita.

La revocación de una sentencia por la admisión o exclusión errónea de evidencia requiere la correspondiente objeción, según dispuesto en la Regla 104 y que el tribunal considere "que el error tuvo un efecto sustancial en el dictamen que se quiere revocar". E. Chiesa, *Reglas de Evidencia de Puerto Rico: Análisis por el Prof. Ernesto L. Chiesa,* San Juan, Publicaciones JTS, 2009, pág. 87. Si

se comete un error en materia de derecho probatorio pero el tribunal estima que, ello no tuvo un efecto significativo sobre el dictamen recurrido, puede confirmarlo, pese al error, que se ha denominado "*harmless error*". E. Chiesa, *op. cit.* pág. 88. Al respecto, el Profesor Ernesto Chiesa comenta:

> El criterio es "*lo más probable*" o "*more likely than not*". Esto ocurre en relación con errores que han sido llamado "*trial errors*" ... En el "*trial error*", el tribunal hace un ejercicio cuantitativo al estimar el efecto del error. Si se trata de un error de admisión errónea de evidencia, la corte revisora "*saca*" del juicio o vista la evidencia erróneamente admitida y se pregunta si con el resto de la evidencia lo más probable es si el resultado hubiera sido el mismo.

Así, una vez la parte afectada por la alegada admisión errónea de evidencia demuestra que la objetó oportuna y correctamente, corresponde al tribunal apelativo determinar si la admisión "fue factor decisivo o sustancial en la sentencia o decisión cuya revocación se solicita". *Pueblo v. Ruiz Bosch*, 127 DPR 762, 781 (1991). El criterio aplicable es "si de no haberse admitido erróneamente la prueba en controversia probablemente el resultado hubiera sido distinto." *Pueblo v. Rosaly Soto*, 128 DPR 729, 744-745 (1991); *Pueblo v. Mangual Hernández*, 111 DPR 136, 145 (1981). En otras palabras, si la prueba que erradamente se admitió pudo "haber tenido una influencia notable, determinante, y hasta desmedida, en la mente del juzgador de los hechos en relación con el veredicto, fallo o sentencia que el mismo emitiera en el caso sea este civil o criminal". *Pueblo v. Rosaly Soto*, 128 DPR 729, 745 (1991).

De ordinario, no puede traerse en apelación un señalamiento de error no presentado ante el foro primario. E. Chiesa, *op. cit.,* pág. 89. Aun si la parte incumple con la Regla 104 de Evidencia podríamos considerar su señalamiento de error sobre exclusión o admisión de prueba. Regla 106, 32 LPRA Ap. VI. Habrá de ser un "error extraordinario" y procederá si se cumplen las siguientes condiciones: (a) el error fue craso, pues es indudable que se

cometió, (b) el error fue perjudicial, pues tuvo un efecto decisivo sobre el dictamen recurrido o (c) de no corregirse, fracasaría la justicia. *Íd.*; *Pueblo v. Bonilla Peña*, 183 DPR 335, 348 (2011).

*-F-*

Las Reglas de Procedimiento Civil proveen para el pago de honorarios de abogado —que no constituye parte de las costas— a favor de la parte que prevalece, no a su abogado. R. Hernández Colón, *Práctica jurídica de Puerto Rico, Derecho procesal civil*, 5ta ed. revisada, LexisNexis de Puerto Rico, 2010, pág. 390. Los honorarios de abogado proceden "por haber ocupado innecesariamente el tiempo de la administración de justicia". *Íd.* La Regla 44.1 (d) de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1 (d), establece:

> (d) Honorarios de abogado. - En caso que cualquier parte o su abogado o abogada haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta. ...

La imposición de honorarios de abogado procede en derecho cuando una parte actuó con temeridad o frivolidad. *Torres Vélez v. Soto Hernández*, 189 DPR 972, 993 (2013). Es norma, se incurre en temeridad cuando se promueve un pleito frívolo, o se provoca un litigio que se pudo evitar, o se prolonga indebidamente, obligando a la otra parte a incurrir en gastos innecesario. *Marrero Rosado v. Marrero Rosado*, 178 DPR 476, 504 (2010); *Colón Santos v. Coop. Seg. Mult. P.R.*, 173 DPR 170, 188 (2008); *Domínguez v. GA Life*, 157 DPR 690, 706 (2002). "[L]a temeridad es una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia". *Jarra Corp. v. Axxis Corp.* 155 DPR 764, 779 (2001). La sanción pecuniaria por conducta temeraria tiene el propósito de "disuadir la litigación frívola y fomentar las transacciones mediante sanciones que

compensen a la parte victoriosa los perjuicios económicos y las molestias producto de la temeridad de la otra parte". *Marrero Rosado v. Marrero Rosado*, supra, pág. 505. El fin de la imposición de honorarios de abogado es penalizar a la parte que por su "terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconvenientes de un pleito". *C.O.P.R. v. S.P.U.*, 181 DPR 299, 342 (2011).

Una determinación de temeridad descansa en la sana discreción del juzgador. *Ramírez Anglada v. Club Cala de Palma*, 123 DPR 339, 349 (1989). La determinación sobre temeridad no será revisada, a menos que sea excesiva, exigua o constituya un abuso de discreción. *Ramírez Anglada v. Club Cala de Palma, supra*, pág. 350.

*-III-*

*-A-*

Comenzamos nuestra consideración por medio del análisis de los primeros siete errores, el error nueve, diez y once. Todos versan sobre los mismos elementos fácticos y probatorios que, según el apelante liberan de responsabilidad a la corporación pública encargada de la administración del servicio eléctrico en nuestra jurisdicción para la fecha de los hechos. La parte apelante solicita la revocación de la sentencia apelada puesto que, el apelado no aportó prueba sobre: (1) la "titularidad, poder o control del hueco"; (2) "la existencia del hueco" antes del accidente; (3) el conocimiento de la Autoridad de Energía Eléctrica (AEE) sobre "la situación de peligrosidad que representaba el hueco"; y (4) el tiempo que el hueco estuvo destapado, descuidado o desatendido. Sobre estas premisas, la parte apelante concluye:

> Fíjese, que el deber de la AEE de corregir la situación de peligrosidad se activa una vez la AEE adviene en conocimiento de su existencia ya sea porque es alertada en cuanto a ello o porque lo descubre a través de las gestiones de su personal.
>
> [...]
>
> El TPI adjudicó un 90% de responsabilidad a la AEE cuando, según hemos señalado a través de este escrito, no se desfiló ni una sola pieza de prueba admisible que demostrara que existía una condición de peligrosidad que era o debió ser conocida por la AEE y esta no hizo nada al respecto.

La existencia de los daños sufridos por la parte apelada no está en controversia. Tampoco está en controversia la forma del siniestro. Mientras el apelado trabajaba en el manteamiento de las áreas verdes en La Villa de Torrimar el pie izquierdo del apelante cayó en un hueco imperceptible a la vista que, contenía un cable eléctrico desprovisto de capa aislante. La bota del apelante hizo contacto con el cable, el apelante recibió una descarga eléctrica. La chispa eléctrica provocó un fuego en el calzado del apelante, en su media, y en parte del pantalón. El incendio consumió parte de la bota y la media del apelante hasta quemar las capas de piel de su pie. Esto ocasionó quemaduras de consideración al pie del apelante. Las heridas causadas por la descarga eléctrica requirieron de una extensa y dolorosa recuperación médica. Debido al incidente, el apelante desarrolló fobia a la energía eléctrica.

Las partes comparecientes difieren en torno a la conclusión del tribunal apelado respecto a la causa de tales daños. El tribunal de primera instancia concluyó la existencia de una relación causal entre el accidente y el estado del cable al momento de los hechos. Concluyó que, la parte apelante incumplió con su deber de vigilancia y mantenimiento en torno al cable desprotegido. Desprovisto de una capa aislante, era previsible la ocurrencia de un accidente como el sufrido por el apelado. Por ello, impuso un 90% de responsabilidad por la culpa *in vigilando* del apelante sobre

la toma de corriente. También, impuso un 10% de responsabilidad al apelado debido a su falta de cuidado mientras podaba el césped en las áreas comunes de la urbanización.

La parte apelante no está de acuerdo con las determinaciones del foro apelado, postula que, la causalidad del accidente fue la falta de cuidado del propio apelado al no vigilar sus pisadas durante su estancia en la urbanización. Esto sobre la base del testimonio del apelado quien declaró haber visto huecos en condiciones similares a las descritas en la demanda en distintas partes de la comunidad. Igualmente, aseguró que, en todo caso el verdadero responsable por el estado de la toma de corriente es la Asociación de Residentes de La Villa de Torrimar. Según el apelante, los residentes del lugar conocían del estado decrépito del hueco, pero no notificaron a la corporación pública sobre tal hecho. Entonces, según el postulado del apelante, al no recibir notificación del estado precario de la toma de corriente nunca quedó activado "el deber de la AEE de corregir la situación de peligrosidad".

Desde comienzos del siglo pasado es norma en nuestra jurisdicción la responsabilidad de mantenimiento y protección al público que recae sobre la AEE. La parte apelante es responsable de aislar de manera efectiva las líneas de transmisión o proveer otros medios de protección al público, particularmente cuando cables electrificados están ubicados en lugares donde el público tiene derecho a estar, y existe la probabilidad que vengan en contacto con ellos. Véanse, *Pacheco v. A.F.F.*, 112 DPR 296 (1982); *Vda. de Dávila v. Fuentes Fluviales*, 90 DPR 321 (1964); *Matos v. P.R. Ry., Lt. & P. Co.*, 58 DPR 160 (1941); *Orta v. P.R. Railway, L. & P. Co.*, 36 DPR 743 (1927); y *Rosado v. Ponce Railway & Light Co.*, 18 DPR 609 (1912). El Tribunal Supremo explicó el fundamento para la norma:

Como el alambre transmisor de corriente de alta tensión no ofrece peligro a menos que venga en contacto con las personas, la jurisprudencia exige que se cubra con material que impida que se escape la corriente sólo cuando haya la probabilidad de que pueda existir tal contacto. Entendemos que la anterior norma es adecuada y que, por consiguiente, la debemos seguir en cuanto a los aisladores que se deben colocar en los cables tensores.

*Matos v. P.R. Ry., Lt. & P. Co.*, 58 DPR 160, 164 (1941).

En *Ramos v. Aut. Fuentes Fluviales,* 86 DPR 603, 609 (1962), el Tribunal Supremo reiteró el cuidado que deben ejercer las corporaciones o personas dedicadas a generar y distribuir electricidad en Puerto Rico:

Las personas o empresas que se dedican a generar y distribuir electricidad deben ejercitar el más alto grado de cuidado para evitar causar daño, atendido el carácter inherentemente peligroso de este elemento. Ahora bien, no tienen la responsabilidad de un asegurador, y por tanto, no responden en cualquier caso en que se cause un perjuicio, a menos que el daño haya sido producido por su culpa o negligencia al omitir desplegar un grado de cuidado en proporción al riesgo o peligro envuelto. Este grado de cuidado no se extiende únicamente a la instalación, mantenimiento y operación de la planta productora de la electricidad y las líneas que la conducen; incluye, además, la obligación de realizar una inspección adecuada para descubrir defectos y situaciones de peligro o riesgo para el público. [Citas omitidas.]

Es evidente, pues, que, la AEE tiene el deber de mantener sus líneas eléctricas en condiciones tales que no representen un peligro al público. *Sucn. Vega Marrero v. A.E.E.*, 149 DPR 159, 172 (1999). El gravísimo riesgo que, representa un cable eléctrico energizado no aislado requiere una atención de la más elevada diligencia de la parte apelante, cosa que no ocurrió en este caso. Conforme surge de la evidencia desfilada en el juicio, tanto La Villa de Torrimar como la compañía para la cual trabajaba el apelado en aquel momento, previo al incidente, habían notificado varias veces a la apelante sobre el descuido de varias tomas de corriente en distintos lugares de la urbanización. Sin embargo, nada hizo el apelante para remediar la situación de peligro. Entidades como la apelante deben ejercer el mayor grado de cuidado y precaución cuando se trata de asuntos de tanta peligrosidad al público como

el de líneas eléctricas energizadas descubiertas en el suelo. En esta situación, el estándar de cuidado exigible, si bien no es absoluto, es más riguroso que el ordinario, en proporción al grave peligro que la situación aludida conlleva. *Sucn. Vega Marrero v. A.E.E.*, *supra*, pág. 176.

La parte apelante dice estar libre de responsabilidad pues no fue notificada sobre la condición de peligrosidad que representaba el estado de descuido de la toma de corriente. La norma impone sobre el apelante una responsabilidad *in vigilando* sobre sus cables de transmisión de energía eléctrica. Esto tipo de responsabilidad, similar a la de los padres sobre sus hijos,[2] impone sobre la corporación pública un deber activo de supervisión adecuada sobre los equipos de transmisión de energía en nuestra jurisdicción. Esto incluye las tomas de corriente objeto de la demanda de título. En condiciones óptimas la toma de corriente objeto de discusión no debió representar un riesgo o peligro a una persona que discurra por las áreas verdes de la urbanización. Es previsible que, en una comunidad como La Villa de Torrimar las áreas verdes comunales estén sujetas diariamente al tráfico constate de residentes, visitantes y empleados de la urbanización. Igual de previsible es que, estas tomas de corrientes queden cubiertas por vegetación, basura o que, no sean de fácil percepción a la vista.

Empero, la parte apelante no aportó prueba que lograra demostrar que cumplió con su responsabilidad de monitoreo y mantenimiento. No podemos vislumbrar siquiera el último momento de inspección del apelante sobre sus instalaciones en la comunidad La Villa de Torrimar. Tampoco presentó prueba que permita atribuir la culpa del suceso a alguna otra entidad pública

---

[2] *Cruz Rivera v. Rivera*, 73 DPR 682, 686 (1952).

o privada. Esto es, el expediente carece de prueba que permita atribuir la causa próxima del siniestro a alguna otra provocación que no fuera la propia omisión del apelante al fallar con su deber de vigilancia, y mantenimiento, como causa idónea para el estado peligroso del cable al momento de caer el pie del apelado en la toma de corriente. Ninguna otra persona natural o jurídica está autorizada por nuestro ordenamiento a cumplir con tal deber. Corresponde a la parte apelante remediar cualquier condición peligrosa que su propiedad pudiera representar al público en general. El accidente ocurrido en este caso es simplemente otra manifestación más de la conocida norma de previsibilidad. H. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1989, Vol. I, Cap. VII, pág. 185. La víctima bien pudo ser un residente, un visitante, un trabajador, inclusive un intruso. El factor decisivo es la probabilidad de riesgos. Era previsible la ocurrencia de algún tipo de accidente mientras persistía la condición de peligro en la toma de corriente. Era solo cuestión de tiempo y probabilidad.

Reiteramos, el negocio al cual se dedica la parte apelante conlleva un deber especial de vigilancia, cuidado y protección hacia el público en general. *Ramírez v. E.L.A.*, 140 DPR 385, 393-394 (1996). En este caso, la parte apelante omitió cumplir con su deber respecto a los residentes y visitantes de la Villa de Torrimar al dejar descuidado el cable con el cual tropezó el apelado. Omitir estas diligencias constituye negligencia que, de causar daños, genera un deber extracontractual de compensar al perjudicado. La responsabilidad del apelante no adviene a la vida jurídica previa notificación del peligro y riesgo. La parte apelante tiene una responsabilidad continua y permanente de inspección, cuidado y mantenimiento sobre las líneas eléctricas en La Villa de Torrimar. El riesgo de causar daño que representaba el cable a alguna

persona en La Villa de Torrimar era totalmente previsible. *López v. Porrata Doria*, 169 DPR 134, 151 (2006); *Toro Aponte v. E.L.A.*, 142 DPR 464, 473 (1997); *Ramos v. Carlo*, 85 DPR 353, 358 (1962). Es la probabilidad de un riesgo, no la posibilidad, lo que activa el deber de tomar medidas preventivas. *Crespo v. H.R. Psychiatric Hosp., Inc.*, 114 DPR 796, 808 (1983). La parte apelante incumplió con su deber.

No debe quedar duda, la causa idónea del incidente fortuito fue la omisión de la parte apelante con su deber social de mantener sus equipos e instalaciones en condiciones idóneas. Poco importa la titularidad del cable, o de la toma de corriente, o cuanto tiempo estuvo presente la condición de peligro. Es de conocimiento general en Puerto Rico, el único ente autorizado a administrar la red eléctrica local es la parte apelante o alguna de sus compañías aliadas. De cualquier modo, la parte apelante no objetó el testimonio del apelado cuando declaró regresar a la toma de corriente después del accidente y observó cómo la toma quedó cubierta por una nueva tapa inscrita con el nombre de la parte apelante. Es bien sabido que, si no se levantó el argumento de inadmisibilidad de la prueba en el foro primario la parte apelante estará impedida de "levantar el punto de la inadmisibilidad de dicha evidencia por primera vez en apelación". *Pueblo v. Rivero, Lugo y Almodóvar*, 121 DPR 454, 476 (1988). En cambio, al contrainterrogar al apelado escogió traer nuevamente la evidencia ante la atención del tribunal. Difícilmente puede argumentar ahora un error sobre la evidencia admitida durante el juicio. Reglas 104 y 105 de Evidencia, 32 LPRA Ap. VI.

Por tanto, una vez la prueba sobre la titularidad fue ofrecida, no objetada, y admitida por el tribunal, correspondía al apelante ofrecer prueba para demostrar la señoría de la toma de corriente en otra persona. No lo hizo, ahora, en apelación pretender objetar

la admisión de evidencia a nivel de primera instancia con argumentos no considerados por el foro de primera instancia. La norma apelativa nos impide entretener tal contención. En consecuencia, los errores señalados no fueron cometidos por el foro de primera instancia.

**-B-**

Por vía del octavo error, la parte apelante pretende la enmienda de la sentencia apelada a los fines de volver a traer al pleito a la Asociación de Residentes de La Villa de Torrimar para adjudicarle un por ciento de culpa por los daños sufridos por el apelado. Olvida la parte apelante que, la parte apelada y la codemandada asociación de residentes pactaron culminar las desavenencias entre ellos por medio de una transacción judicial. Inclusive, según surge del expediente la parte apelante tuvo oportunidad de objetar respecto a la salida del pleito de la asociación, pero guardó silencio al momento del tribunal considerar el desistimiento solicitado por las partes.

El 31 de agosto de 2022 el tribunal apelado emitió una *Sentencia Parcial* mediante la cual declaró renunciado el pleito en cuanto a La Villa de Torrimar, esto a petición de la parte apelada y la propia asociación de residentes. En la *Minuta* de la *Vista Transaccional* celebrada el día anterior al dictamen, quedó consignado en el récord la falta de reparo del apelante respecto al desistimiento promovido. En aquella vista el tribunal ordenó el archivo con perjuicio de la causa en contra de la parte codemandada sujeto a la entrega de cierta prueba documental a la parte apelada. La Villa de Torrimar cumplió con la condición impuesta por el tribunal. La Asociación de Residentes quedó fuera del pleito y libre de toda responsabilidad respecto al apelado. Además, el apelante muy bien pudo apelar la sentencia parcial o inclusive intentar traer al pleito a la asociación como tercero

demandada. Sin embargo, nada hizo y ahora pretende corregir en apelación su descuido. No avalamos la inconsistencia en las actuaciones procesales de la parte apelante.

Comparece ante el foro judicial y pretende que usurpemos los prerrogativas y facultades innatas al manejo del caso y juico del Tribunal de Primera Instancia. Es norma, a nadie es lícito ir contra los propios actos. La conducta contradictoria como la demostrada por la parte apelante no tiene lugar en el campo del Derecho, y debe ser impedida. *Int'l Gen. Elec. v. Concrete Builders*, 104 DPR 871, 877, (1976). El error apuntado no fue cometido.

### -*C*-

La parte apelante protesta la imposición de honorarios de abogado por temeridad acusada por el foro apelado. Un simple examen del expediente del caso a nivel del tribunal de primera instancia denota la temeridad proyectada por la parte apelante al caso desde el principio del pleito. La parte apelante extendió por años el presente pleito por su falta de diligencia y al promover un pleito carente de una defensa adecuada en Derecho. Como vimos, de los hechos del caso surge prístinamente la omisión de la parte apelante respecto a la inspección y mantenimiento de la toma de corriente donde cayó el pie del apelado. La página número uno del anejo uno de la *Moción en cumplimiento de orden* presentada el 7 de septiembre de 2022 por La Villa de Torrimar muestra que, para la fecha del escrito, la urbanización había presentado seis querellas (WR516232; WR5289363; WR5156233; WR5156237; WR5156239; WR5156241) ante el apelante respecto al estado peligroso de las tomas de corriente en la urbanización. No surge del récord atención alguna del apelante sobre estas querellas. La página dos del anejo uno, muestra que, desde el 27 de abril de 2017 la asociación de residentes reportó una "tapa de soterrado rota" a la parte apelante. Esta querella (WR513018) estuvo activa,

sin atención del apelante hasta el 20 de marzo de 2019 cuando fue referida "nuevamente al supervisor par que le indique al personal técnico". Tampoco surge del caso actuación alguna de la parte apelante sobre esta querella. Toda esta prueba fue entregada a la parte apelante. No obstante, la parte apelante insiste que, nunca recibió notificación de la urbanización sobre estos asuntos. La prueba claramente contradice la proposición del apelante, desde principios del año 2017 hasta el año 2019 fue notificada y re notificada la condición de peligrosidad que representaban las tapas rotas de algunas de las líneas soterradas en la urbanización. Solo fue hasta después de la ocurrencia del accidente del apelado, el 25 de julio de 2018 que, la parte apelante tomó medidas preventivas para proteger de posibles electrocuciones a los residentes y visitantes de La Villa de Torrimar. Pero inclusive, según muestra el expediente, el remedio provisto por la apelante fue incompleto pues la última llamada documentada ocurrió el 20 de marzo de 2019 después de presentado el pleito del epígrafe. Esto denota una crasa omisión del apelante con su deber legal de vigilancia y mantenimiento de los cables en La Villa de Torrimar. "Es norma reiterada que la imposición de honorarios de abogado sólo procede cuando una parte ha actuado con temeridad o frivolidad". *Santiago v. Sup. Grande*, 166 DPR 796, 820 (2006). El Tribunal Supremo expresó el propósito de la sanción:

> [E]s penalizar [...] al litigante perdidoso que[,] por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente a asumir las molestias, gastos, trabajo e inconvenientes de un pleito.

> *Íd.*

La determinación de temeridad o frivolidad está sujeta a la sana discreción del Tribunal de Primera Instancia. Sin embargo:

> [N]o existe temeridad cuando lo que se plantea ante el tribunal de instancia son planteamientos complejos y novedosos que no han sido resueltos en nuestra jurisdicción. Tampoco existe temeridad en aquellos casos

en que el litigante actúa de acuerdo [con] la apreciación errónea de una cuestión de derecho y no hay precedentes establecidos sobre la cuestión, o cuando existe alguna desavenencia honesta en cuanto a quién favorece el derecho aplicable a los hechos del caso.

*Santiago v. Sup. Grande, supra*, pág. 821.

En el caso ante nuestra consideración no existían desavenencias honestas en la aplicación del derecho. El asunto objeto de demanda no era cuestión novel, es norma firmemente asentada en nuestra jurisdicción. No obstante, la parte apelante, en abstracción de la norma prevaleciente, presentó defensas inmeritorias y contradictorias a la prueba contenida en el expediente. En suma, la parte apelante insistió en proseguir el pleito sobre defensas desprovistas de fundamento jurídico. Por esta razón, y por su falta de diligencia, extendió por años un pleito que muy bien pudo culminar en una etapa más temprana.

El apelante responde civilmente por sus omisiones en el cumplimiento de su deber de cuidado con el público respecto a sus facilidades e instalaciones de energía eléctrica. La parte apelante fue temeraria. A raíz de las todas las querellas presentadas por la urbanización y al investigar el accidente del apelante, supo que, la situación fáctica existente en aquel momento era en extremo peligrosa, pues estaban desprovistos de aislamiento unos cables de alto voltaje. Todo en contravención a las normas de seguridad correspondientes. De acuerdo con la jurisprudencia vigente, era evidente su responsabilidad, aun cuando fuera comparada. No obstante, sin admitir francamente su omisión, ni hacer una oferta de sentencia, prolongó el pleito innecesariamente. *Torres Solis et al. v. A.E.E. et als.*, 136 DPR 302, 316 (1994); *Fernández v. San Juan Cement Co., Inc.*, 118 DPR 713, 719 (1987); *Pérez Cruz v. Hosp. La Concepción*, 115 DPR 721, 739-740 (1984).

Consecuentemente, el apelante demostró una actitud temeraria y frívola inclusive ante esta curia. El Tribunal de Primera

Instancia no erró al concluir que, las actuaciones de la parte apelante fueron temerarias.

En consideración a la temeridad demostrada por la parte apelante durante todo el trámite de este pleito, inclusive en la etapa apelativa, al hacer abstracción de la norma vigente e insistir en argumentos carentes de fundamento fáctico y jurídico, imponemos al apelante $15,000 en concepto de honorarios de abogado pagaderos a la parte apelada, el señor Kedwin Miguel Romero. Regla 44.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1.

## -*IV*-

Por los fundamentos antes expuestos, que hacemos formar parte de este dictamen, *confirmamos* la Sentencia apelada y *modificamos* la cuantía de honorarios de abogados impuesta por el foro primario. Por ello, ordenamos al apelante el pago de $15,000 en concepto de honorarios de abogado pagaderos a la parte apelada, el señor Kedwin Miguel Romero.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda.  Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones